IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

| | |
|---|---|
| CORBEY JONES AND CYNTHIA ANN JONES, <br><br>Plaintiffs, <br><br>VERSUS <br><br>JONES COUNTY, MS; SHERIFF JOE BERLIN; DEPUTY JAMES MANN; SGT. JESSE JAMES; DEPUTY COLTON DENNIS; UNKNOWN DEPUTIES OF THE JONES COUNTY SHERIFF 1-5; DONNIE SCOGGIN; AND CAROL JOHNSTON, <br><br>Defendants. | Civil Action No. 2:22-cv-93-KS-MTP |

## COMPLAINT

*Jury Trial Requested*

1. This case involves the tragic death of Andrew Wesley Jones, the Plaintiff's son, at the Jones County Adult Detention Center. As the evidence will show, the Defendants ignored Andrew Jones's serious medical conditions and refused to provide him desperately needed medical treatment. The Defendants simply let him die alone in a cell, without providing him any treatment. This is a case of deliberate indifference to serious medical needs, and the Defendants are liable for the violation of Andrew Jones's civil rights and ultimate death.

### I.  JURISDICTION

2. This action is brought pursuant to 42 U.S.C. § 1983 based on the Fourteenth Amendment to the United States Constitution. Jurisdiction is founded on 28 U.S.C. § 1331, and the

1

aforementioned statutory and constitutional provisions. Plaintiffs also invoke supplemental jurisdiction over claims under state law pursuant to 28 U.S.C. §1367.

## II.     PARTIES

### (Plaintiffs)

3.      **CORBEY JONES** is an adult citizen of the United States and is domiciled in the Southern District of Mississippi. He is the natural father of Andrew Wesley Jones, who died unmarried and without children.

4.      **CYNTHIA ANN JONES** is an adult citizen of the United States and is domiciled in the Southern District of Mississippi. She is the natural mother of Andrew Wesley Jones, who died unmarried and without children.

### (Defendants)

**Named defendants herein are:**

5.      **JONES COUNTY, MISSISSIPPI ("JONES COUNTY")**, is a political subdivision of the State of Mississippi and is a legal entity capable of suing and being sued.

6.      **SHERIFF JOE BERLIN**, in his individual and official capacity as Sheriff of Jones County, is an adult citizen of the State of Louisiana and domiciled in the Southern District of Mississippi. At all times described herein, he was the Sheriff of Jones County and, as such, was responsible for the hiring, training, supervision, discipline, and control of the deputies under his command, as well as any medical personnel servicing correctional facilities. He was responsible for all actions of staff and employees of the Jones County Sheriff's Department. He was also responsible for the supervision, administration, policies, practices, customs, and operations of the Jones County Adult Detention Center ("Detention Center" or "the Jail"). He was and is a final policy maker. He is liable both directly and vicariously for the actions complained of herein.

7.      **JONES COUNTY DEPUTIES JAMES MANN, SGT. JESSE JAMES, COLTON DENNIS**, and **UNKNOWN JONES COUNTY DEPUTIES 1-5**, in their individual capacities as Jones County Sheriff's Deputies, are adult citizens of the State of Mississippi and, on information and belief, are domiciled in the Southern District of Mississippi. At all pertinent times, these Defendants were employed by Sheriff **JOE BERLIN** and/or **JONES COUNTY** as correctional officers assigned to the Jones County Adult Detention Center. These Defendants were acting in the course and scope of that employment at all relevant times.

8.      **DONNIE SCOGGIN**, **NP**, in his individual capacity, is an adult citizen of the State of Mississippi and, on information and belief, is domiciled in the Southern District of Mississippi. At all relevant times, Defendant **SCOGGIN**, a licensed nurse practitioner, had a contract with **JONES COUNTY** and/or **SHERIFF JOE BERLIN** to provide medical care at the Jones County Adult Detention Center.

9.      **CAROL JOHNSTON,** in her individual capacity, is an adult citizen of the State of Mississippi and, on information and belief, is domiciled in the Southern District of Mississippi. At all relevant times, Defendant **JOHNSTON**, who holds a nursing license, was employed by **JONES COUNTY** and/or **SHERIFF JOE BERLIN** to provide medical care to inmates at the Jones County Adult Detention Center. She was acting in the course and scope of that employment at all relevant times.

### III.    FACTUAL ALLEGATIONS

10.     Suffering under the pressures of the pandemic, Andrew Wesley Jones, the Plaintiffs' thirty-four year old son, began to have severe mental and emotional difficulties during the summer of 2020. Although Andrew had struggled with drug addiction issues in the past, and these had gotten worse after his fiancée committed suicide, he was a valued member of the

community. He worked as a high school cheerleading teacher and coach, and he was loved and respected by his students and community. He was also loved by his family. Before the events of this case, he had never before been arrested.

11. In early September 2020, Andrew started to exhibit symptoms of psychosis, which prompted his parents to take him to the hospital. Andrew was ultimately referred to a psychiatric crisis stabilization facility, and then to inpatient addiction treatment and psychiatric facilities. Andrew was diagnosed with bipolar disorder, depression, anxiety, drug addiction, and post-traumatic stress disorder at these facilities. He started a course of intensive treatment and, after some months, he started to stabilize on medications and his condition was improving.

12. In mid-November 2020, Andrew tested positive for HIV while he was at one of the in-patient treatment centers. Andrew had tested negative for HIV approximately two months prior, meaning that the exposure and infection had occurred relatively recently.

13. On or about November 30, 2020, Andrew tested positive for COVID at the in-patient treatment facility where he was residing. Because of the positive test result, and for the safety of other patients, Andrew was sent home to quarantine.

14. Andrew returned to living with his parents after the positive COVID test. Unfortunately, shortly after Andrew returned home his father, the Plaintiff Corbey Jones, became sick with the COVID virus.

15. Shortly after testing positive for COVID, Corbey Jones was admitted to the hospital. Within hours of his hospital admission, the doctors recommended that he be placed on a ventilator. Mr. Jones would remain sedated and on the ventilator for the next sixty (60) days. By the time he regained consciousness, his son Andrew would be dead.

16.     Blaming himself for his father's infection, Andrew succumbed to his addictions and started using drugs and alcohol again.  While intoxicated, on December 9, 2020, he was arrested after he was accused of unlawfully entering someone's house.

17.     Andrew was booked into the Jones County Adult Detention Center (the "Detention Center" or "the Jail").

18.     During the booking process, Andrew reported to the intake deputy that he suffered from high blood pressure, HIV, and psychiatric problems.  In response to a question about suicidal thoughts, Andrew reported that he was currently thinking about suicide and had attempted suicide in the past.

19.     The intake deputy did not document any physiological or neurological symptoms at the time of Andrew's booking on December 9, 2020.

20.     Defendant **SCOGGIN** is a nurse practitioner and a Mississippi state representative who had a contract with Defendant **SHERIFF BERLIN** to provide medical care to inmates at the Detention Center.[1]

21.     Defendant **JOHNSTON** is a nurse who is employed by Defendants **JONES COUNTY** and **SHERIFF BERLIN** to provide medical care to inmates at the Detention Center.

22.     After repeated requests for all medical records in possession of **JONES COUNTY**, **SHERIFF BERLIN**, and/or **SCOGGIN**, the Plaintiffs have received only very limited records consisting of one page of a Medication Administration Record ("MAR") and two pages of handwritten notes showing appointments Andrew attended at outside medical providers.

23.     The MAR was apparently cut off during copying, and so only a limited amount of information is visible.  This document shows that Andrew likely received Trileptal,

---

[1] Months prior to filing this lawsuit, and pursuant to Mississippi public record laws, Plaintiffs' counsel requested from Defendant **SHERIFF BERLIN**'s counsel a copy of this contract.  However, it has not been produced.

Benzotropine, and Doxipine while he was at the jail, but it does not show the dates he received these medications. The MAR is stamped "CHARTED FOR DONNIE SCOGGIN." Based on this record, it is believed **SCOGGIN** prescribed these drugs for Andrew. However, there are no other records showing why these drugs were prescribed.

24.     On December 18, 2020, Andrew saw a physician at the Hattiesburg Clinic, but there is no explanation in the Detention Center records showing why this appointment was scheduled.

25.     Andrew had been a patient at the Hattiesburg Clinic for many years. He had a history of anxiety, depression, skin ailments, and hypertension. The physician noted that Andrew had tested negative for HIV about two months prior, but was now positive. Andrew also reported lesions on his left thigh (Andrew had Schamberg's disease and a history of skin problems). The physician noted that Andrew wanted to start medication for HIV. The physician ordered labs and prescribed Andrew two medications used to treat HIV (Descovy and Tivicay).

26.     There are no records showing that either **SCOGGIN** or **JOHNSTON** provided Andrew with the HIV medications prescribed by the physician at Hattiesburg Clinic. On information and belief, and based on the roles they play in provision of health care at the Detention Center, both these Defendants knew or should have known that Andrew had been prescribed HIV medications. However, they deliberately failed to provide him the medications he had been prescribed.

27.     On December 21, 2020, Andrew was taken to South Central Behavioral Health, where he saw a psychiatrist. Again, there are no jail records showing what precipitated this referral. Andrew reported a history of depression, anxiety, and substance abuse. He further reported that he was diagnosed with HIV one month ago. Although he reported having depression and thoughts of death one week before this encounter, Andrew denied current suicidal ideations and

the psychiatrist did not order that suicide precautions be taken for Andrew. The psychiatrist prescribed Wellbutrin SR 150 mg daily in the morning for Andrew and a follow up in one month. He also ordered that labs be conducted for Andrew.

28. There are no records showing that **SCOGGIN** or **JOHNSTON** provided Andrew with the Wellbutrin that the psychiatrist prescribed to him.

29. After Andrew returned to the jail on December 21, 2020, the lab called South Central Behavioral Health to report a critical high result for Andrew's ALT, which is a test for liver function. The Behavioral Health nurse reported this result to the psychiatrist, who directed that Andrew be seen by a primary care physician because of the lab result.

30. The Behavioral Health nurse called the jail on December 21, 2020 and left a voice mail for Defendant **JOHNSTON** about Andrew's test results.

31. Defendant **JOHNSTON** did not return the Behavioral Health nurse's call. The nurse therefore left another voice mail for her, which was also not returned. On December 28th, the nurse attempted to contact **JOHNSTON** through the jail's main phone number, and left a message with a deputy asking that **JOHNSTON** return her call.

32. The nurse tried to reach Defendant **JOHNSTON** yet again on January 4, 2021. She left another message, and later that day **JOHNSTON** finally returned the call. The nurse advised **JOHNSTON** of the critical lab values that had been discovered and she also faxed Andrew's lab results to the jail. The nurse noted that Andrew needed to be seen by another doctor.

33. On information and belief, **JOHNSTON** never took any action with respect to the critically high lab results, which were indicative of a problem with Andrew's liver.

34.     At some point on January 4, 2020, the Hattiesburg Clinic physician saw Andrew again. The records state that Andrew was seen for HIV follow up, and there is no indication that **JOHNSTON** advised the Clinic of Andrew's lab results.

35.     The Hattiesburg Clinic physician reported as follows: "Patient has not received HIV medications. Patient should be able to pick up medications from Jones County. Patient reported some constipation since last visit. Patient reported sinus congestion/drainage. Patient reported trouble sleeping and 'bed rash' as well."

36.     According to these records, on January 4, 2021, Andrew was not displaying any neurologic symptoms (such as seizures or shaking), his vitals were normal, and there were no other significant findings.

37.     On January 9, 2021, Andrew was being held at the Detention Center in an isolation cell, MX 113, which had no windows except a small port in the door and a food slot, which was kept locked when not in use. The cell also contained a video surveillance system. On information and belief, this was a maximum security cell at the Detention Center.

38.     Despite repeated requests, **SHERIFF BERLIN** has failed to produce any records showing why Andrew—a first-time offender on a non-violent charge—was being held in a maximum security isolation cell, or for how long he had been there, or under what protocols and conditions.

39.     The Plaintiffs have obtained video surveillance footage from Andrew's cell on the day of his death. The footage starts at 6:00 a.m. on January 9, 2021. It is apparent almost immediately that Andrew is in dire need of medical attention. He is obviously incredibly weak and is having trouble controlling his own body. His movements are spastic, he shakes uncontrollably, and he is unable to stand up or walk even a few feet across his cell.

40. At approximately 6:25 a.m., Andrew struggles to sit up in bed. He had taken his jail-issued jumper partially off at some point before, and he attempts to put it back on. However, his hands and head are clearly shaking, he cannot stand up from the bed, and he moves like he is heavily intoxicated. He attempts to put his arms through the jumper sleeves, unsuccessfully, for a full ten minutes before he gives up and collapses back on the bed. It takes him another two minutes of struggle and effort to get the blanket over his feet and the rest of his body. It is clear that he cannot control his own movements enough to simply sit up and arrange the blanket over his feet.

41. At approximately 6:53 a.m., after Andrew does not come to the door when called, Defendant Deputy **COLTON DENNIS** throws a laundry bag into the cell.

42. From approximately 7:01 to 7:08 a.m., Andrew works to take his jumper—which was already partially off—completely off. Again, it is clear from this footage that Andrew is unable to stand up from the bed, that he is shaking uncontrollably, and that he is suffering from a medical emergency. At one point, Andrew apparently attempts to reach for his jail issued slippers, which are on the floor approximately two or three feet from the bed. However, Andrew is not able to reach the slippers, nor is he able to reach the laundry bag that **DENNIS** had thrown into the cell. It is clear that Andrew is unable to stand up from the bed.

43. At approximately 7:08 a.m., Andrew finally manages to free himself from his jumper, and he collapses back on the bed. He then attempts to arrange the blanket over himself for another two minutes.

44. At approximately 7:51 a.m., Defendant **MANN** unlocks the food slot and calls out to Andrew, who does not respond or get out of bed. On information and belief, the normal protocol

at the Jail is for inmates in maximum security to retrieve their food from the slot. However, because of his dire medical condition, Andrew is unable to stand up to get his food.

45. On information and belief, Defendant **MANN** recognized that Andrew was unable to retrieve his food from the food slot. Therefore, at approximately 7:53 a.m., Defendant **MANN** brings Andrew's Styrofoam tray of food into the cell and places it on a table across from the bed where Andrew is lying.

46. Shortly after **MANN** leaves, Andrew attempts to get out of bed, probably to retrieve the food. However, he is unable to stand up.

47. Starting at approximately 8:00 a.m., Defendants **MANN** and **JAMES** pass out medications to inmates housed in the maximum security cells. On information and belief, the general protocol is for inmates to come to the door when called to receive their medications.

48. When **MANN** arrives at Andrew's cell, Andrew cannot get out of bed to walk to the door. **MANN** recognizes this, and enters Andrew's cell to speak with him. On information and belief, Andrew told **MANN** that he, Andrew, could not stand up to receive his medications, nor could he walk to get himself any water from the small sink on the other side of the cell.

49. Around this time, Defendant **JAMES** arrives at Andrew's cell, and on information and belief **MANN** tells **JAMES** that Andrew cannot stand up or walk to receive his medication. **JAMES** and **MANN** hold the door open to Andrew's cell while an inmate trustee retrieves a cup to use to provide Andrew some water to take his medications.

50. While **JAMES** watches from the doorway, **MANN** enters Andrew's cell and fills the cup with water from the sink. It appears that **JAMES** or **MANN** may have needed to call in to the Jail's security control center to have the water in Andrew's cell turned on.

51.     **MANN** then goes to Andrew in the bed, where Andrew has managed to push himself up to a seated position. Andrew's body and hands are shaking so badly that **MANN** has difficulty placing the pills in Andrew's hand. Andrew then drops two of the pills, which **MANN** has to pick up for him.

52.     After Andrew takes the pills, he hands the cup of water back to **MANN**, who places it on the table on his way out of the cell. However, Andrew asks him for another drink of water, and **MANN** brings the cup back to him in the bed. These actions show that **MANN** and **JAMES**, who was watching the interaction, were aware that Andrew could not walk even a few feet to get himself a drink of water.

53.     After **MANN** places the cup back on the table, **MANN** and **JAMES** leave and lock the cell.

54.     At approximately 8:30 a.m., Andrew starts to attempt to get his food from the table across from the bed. Naked and unable to walk, he manages to throw his blanket on to the ground, and then lowers himself to sit on it. He then drags himself across the floor of his cell on his buttocks. When he gets to the table, he reaches up to take the container of food, but his hands are shaking so badly he cannot hold on to the container. He therefore tries to throw the container over to the bed, but it hits one of his jail-issued slippers and the contents spill on to the floor.

55.     Andrew then struggles around on the floor, trying to make it back to the bed. However, every time he tries to sit up, he falls back on to his back. It is obvious that he cannot control his body and is in the midst of a medical emergency.

56.     Eventually, and with great effort, Andrew is able to drag himself back on to the bed. He lies on his stomach and tries to eat a few bites of food off of the floor.

57.     At approximately 8:40 a.m., Defendant **DENNIS** opens the cell door and observes Andrew lying naked on his bed trying to eat his food off of the floor.  It is obvious that something is seriously wrong with Andrew.  However, **DENNIS** simply closes the door and locks the cell again, and he does not request any medical assistance.

58.     For approximately the next ten to twelve minutes, Andrew attempts to put his jail jumpsuit back on.  However, he is unable to do so because of his condition.  Eventually he gives up and just drapes the jumpsuit across his body, and then manages to pull the blanket over himself.  His hands and body are still shaking throughout this process.

59.     Andrew lies down after managing to put the blanket over himself.  There are spastic motions for the next hour and a half.

60.     Andrew's last movement occurs at 10:53 a.m., and it is believed he died at approximately that time.

61.     Defendants **MANN**, **JAMES**, and **DENNIS** personally observed Andrew's obvious medical distress during the morning of January 9, 2021, as described above.  However, none of these Defendants took any action to obtain medical help for Andrew despite their awareness of his obvious and serious medical distress.

62.     On information and belief, one or more of Defendants **MANN**, **JAMES**, **DENNIS** and/or **UNKNOWN JONES COUNTY DEPUTIES 1-5** were required to monitor the video surveillance feed coming from Andrew's cell on the morning of January 9, 2021.  On information and belief, one or more of these Defendants observed or should have observed Andrew's obvious medical distress on the video feed, as described above.  However, none of these Defendants took any action to obtain medical help for Andrew despite their awareness of his obvious and serious medical distress.

63. It was not discovered that Andrew was deceased until approximate 4:16 p.m. on January 9, 2021.

64. After the discovery, Andrew's body was turned over to the Mississippi Office of the State Medical Examiner. The Medical Examiner opined that the cause of death was HIV infection.

65. To the extent HIV was the cause of or a contributing factor to Andrew's death, the anti-viral HIV drugs that had been prescribed to him by the doctor at the Hattiesburg Clinic likely would have prevented his death. Defendants **SCOGGIN** and **JOHNSTON** failed to provide these drugs to Andrew, despite their awareness that he had been prescribed them.

66. Moreover, independent of the ultimate cause of death, the failure of Defendants **MANN**, **JAMES**, **DENNIS** and/or **UNKNOWN JONES COUNTY DEPUTIES 1-5** to report Andrew's condition on the morning of January 9, 2021 and to take steps that would have led to medical treatment, including transport to the emergency room of a hospital, caused or contributed to his death. On information and belief, Andrew's life would have been saved had he been promptly transported that morning to an emergency room for lifesaving treatment.

67. The failures culminating in Andrew's death—specifically, a failure to provide adequate health care and complete disregard for the serious medical needs of inmates—is a long-term problem at the Jones County Adult Detention Center. On information and belief, there is a longstanding pattern and practice of both guards and medical staff ignoring and disregarding the serious medical needs of inmates. Defendants **JONES COUNTY**, **SHERIFF BERLIN**, **SCOGGIN**, and **JOHNSTON** were aware or should have been aware of the problems with healthcare at the Detention Center but failed to address these problems with adequate reforms.

68. At the time of the detention of Andrew Jones at the Detention Center, Defendants **JONES COUNTY**, **SHERIFF BERLIN**, **SCOGGIN**, and **JOHNSTON** knew or should have

13

known of serious deficiencies in the policies, practices and procedures at the Jail related to medical screening and the care and observation of prisoners generally. Despite their knowledge of these serious deficiencies, these Defendants failed to make necessary changes to policies, procedures, training, supervision or staffing or to intervene to see that Andrew Jones and others in their custody were provided adequate treatment for serious health needs.

69. Defendants **SCOGGIN** and **JOHNSTON** were responsible for providing adequate and appropriate medical care for Andrew Jones, including routing him to the hospital in case of a medical emergency. They were further responsible for the documentation and paperwork necessary for continuity of care of Andrew Jones. These Defendants failed in their responsibility to ensure that Andrew Jones was in a safe, appropriate environment and that he was receiving necessary care for his serious medical needs.

70. The foregoing actions and inactions of all Defendants with respect to the care of Andrew Jones demonstrate deliberate indifference to Andrew's serious medical needs, were the result of that deliberate indifference, and led to his death. Furthermore, these Defendants' actions and inactions regarding the care of Andrew fell below the applicable standard of care and were reckless, grossly negligent, and negligent, and were willful, wanton, and malicious.

71. The Defendants are responsible jointly and severally for the death of Andrew Jones.

## IV.   FIRST CAUSE OF ACTION

72. Plaintiffs repeat and re-allege each and every allegation of this Complaint.

73. The Defendants, acting individually and together, and under color of law, engaged in a course of conduct that acted to deprive Andrew Jones of his constitutional rights and did deprive him of said rights, specifically, the right to a reasonably safe and secure place of detention, reasonable and adequate medical care, the right to be free from cruel and unusual punishment,

and the right to due process and equal protection of the laws as protected by the Fourteenth Amendment.

## V.     SECOND CAUSE OF ACTION

74.    Plaintiffs repeat and re-allege each and every allegation of the Complaint.

75.    Defendants **JONES COUNTY** and **SHERIFF BERLIN**, in his individual and official capacities, and Defendants **SCOGGIN** and **JOHNSTON**, in their individual capacities, established, condoned, ratified, and encouraged customs, policies, patterns, and practices that directly and proximately caused the deprivation of the civil and constitutional rights of the deceased, as alleged herein, and the damages and injuries described herein, in violation of the Fourteenth Amendment to the U.S. Constitution.

## VI.     THIRD CAUSE OF ACTION

76.    Plaintiffs repeat and re-allege each and every allegation of the Complaint.

77.    The supplemental jurisdiction of the Court is invoked for all claims under state law.

78.    At all times described herein, Defendant **SCOGGIN** acted with negligence, gross negligence, and/or recklessness, and below the applicable standard of care, with respect to the medical care that Andrew Jones received at the Detention Center, thereby violating Andrew's rights under Mississippi law.

79.    Defendant **SCOGGIN** acted in derogation of his duty as a medical professional and his treatment of Andrew Jones was beneath the standard of care in the community.

## VII.    DAMAGES

80.    As a result of the actions of the Defendants as described above, damages have been incurred for the pre-death suffering of Andrew Jones and for the wrongful death of Andrew Jones.

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that after due proceedings are had, including a trial by jury, that there be judgment rendered herein in Plaintiffs' favor and against all Defendants individually and jointly, as follows:

1. Compensatory and punitive damages in an amount to be assessed by the jury;

2. Reasonable attorneys' fees, as provided in 42 U.S.C. § 1988 and all costs of these proceedings and legal interest;

3. All other relief as appears just and proper to this Honorable Court.

Respectfully submitted,

/s/ Robert McDuff
Miss. Bar No. 2532
767 North Congress Street
Jackson MS 39202
601-259-8484
rbm@mcdufflaw.com

## CERTIFICATION

I hereby certify that I have reviewed the facts of this case and obtained a consultation with a medical expert qualified to provide expert testimony pursuant to the Mississippi Rules of Civil Procedure and the Mississippi Rules of Evidence, and on the basis of such review and consultation believe that there is a reasonable basis for the commencement of this action.

/s/ Robert McDuff