UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

| | | |
|---|---|---|
| CORBEY JONES, | * | CIVIL ACTION NUMBER: |
| | * | |
| Plaintiff, | * | 2:22-CV-93-KS-MTP |
| | * | |
| VERSUS | * | |
| | * | |
| JONES COUNTY, MS, ET AL. | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION TO DISMISS FILED BY DEFENDANT MEKEDES COLEMAN

Now Comes the Plaintiff, Corbey Jones, through undersigned counsel, and files this Memorandum in Opposition to the Motion to Dismiss filed by Defendant Mekedes Coleman, ECF Docs. 69, 70.  Coleman contends that the Plaintiff's claim against her should be dismissed because the Plaintiff has not alleged a violation of clearly established sufficient to overcome her assertion of qualified immunity.  However, as shown below, it was clearly established law that jailers cannot **ignore** and **do nothing** in response to an inmate's obvious medical emergency.  That is what the Plaintiff's First Amended Complaint alleges Defendant Coleman did.  Accordingly, her Motion to Dismiss should be denied.

## I.       FACTUAL BACKGROUND

This case involves the tragic and preventable death of the Plaintiff's son at the Jones County Adult Detention Center.  As relevant here, the First Amended Complaint alleges Andrew Jones was booked into the Detention Center on December 9, 2020, after he had wandered into the house of a Jones County Sheriff's deputy while intoxicated and grieving the COVID-related hospitalization of his father (the Plaintiff), for which he blamed himself.  ECF Doc. 52 at ¶¶ 13-16.  During intake at the jail, Andrew disclosed that he was HIV positive.  He also disclosed his

on-going and serious psychiatric issues, including that he had previously attempted suicide and was currently thinking about attempting to kill himself again.  Id. at ¶ 17.

For reasons that remain unclear, Andrew was housed in a maximum-security isolation cell, MX113, at the Detention Center.  *Id*. at ¶ 21. The isolation cell has no windows at all and only a small slot for a food tray in the door.  The slot was kept closed and locked while not in use.  There is a video surveillance camera in the cell, which feeds into a display monitor in the Detention Center Control Room.  *Id*. at ¶ 44.  Other than that, there is only a metal bed, a toilet and sink, and a small metal table attached to a wall.  It does not appear that Andrew was permitted to possess books or any other means of keeping himself occupied while he was in the MX cell.  There was no intercom for an inmate to communicate with guards or the Control Room, and the video evidence in this case shows that guards did not conduct regular checks (e.g. fifteen- or thirty-minute checks) on inmates who were housed in isolation.  ECF Doc. 52 at ¶¶ 44-66.  It was therefore critically important to monitor the inmates who were held in isolation via the video security system.  Otherwise, an inmate could go for hours locked alone in a room with no contact with anyone who could help him in case of emergency.  Although there was no reason or justification for a first-time offender like Andrew to be held in such punitive conditions, he would remain isolated and alone in the maximum-security cell for all thirty-one days of his incarceration at the Detention Center.  *Id*. at ¶ 21.

On January 9, 2021, the video surveillance footage from MX113 shows that Andrew had become critically ill and was suffering a medical emergency because of his untreated HIV infection.  As alleged in the FAC:

> 45.      The Plaintiffs have obtained video surveillance footage from Andrew's cell on the day of his death. The footage starts at 6:00 a.m. on January 9, 2021. It is apparent almost immediately that Andrew is in dire need of medical attention. He is obviously incredibly weak and is having trouble controlling his own body.

His movements are spastic, he shakes uncontrollably, and he is unable to stand up or walk even a few feet across his cell.

46.     At approximately 6:25 a.m., Andrew struggles to sit up in bed. He had taken his jail issued jumper partially off at some point before, and he attempts to put it back on. However, his hands and head are clearly shaking, he cannot stand up from the bed, and he moves like he is heavily intoxicated. He attempts to put his arms through the jumper sleeves, unsuccessfully, for a full ten minutes before he gives up and collapses back on the bed. It takes him another two minutes of struggle and effort to get the blanket over his feet and the rest of his body. It is clear that he cannot control his own movements enough even to sit up and arrange the blanket over his feet.

47.     At approximately 6:53 a.m., after Andrew does not come to the door when called, Defendant Deputy COLTON DENNIS throws a laundry bag into the cell.

48.     From approximately 7:01 to 7:08 a.m., Andrew works to take his jumper—which was already partially off—completely off. Again, it is clear from this footage that Andrew is unable to stand up from the bed, that he is shaking uncontrollably, and that he is suffering from a medical emergency. At one point, Andrew apparently attempts to reach for his jail issued slippers, which are on the floor approximately two or three feet from the bed. However, Andrew is not able to reach the slippers, nor is he able to reach the laundry bag that DENNIS had thrown into the cell. It is clear that Andrew is unable to stand up from the bed.

49.     At approximately 7:08 a.m., Andrew finally manages to free himself from his jumper, and he collapses back on the bed. He then attempts to arrange the blanket over himself for another two minutes.

50.     At approximately 7:51 a.m., Defendant MANN unlocks the food slot and calls out to Andrew, who does not respond or get out of bed. On information and belief, the normal protocol at the Jail is for inmates in maximum security to retrieve their food from the slot. However, because of his dire medical condition, Andrew is unable to stand up to get his food.

51.     On information and belief, Defendant MANN recognized that Andrew was unable to retrieve his food from the food slot. Therefore, at approximately 7:53 a.m., Defendant MANN brings Andrew's Styrofoam tray of food into the cell and places it on a table across from the bed where Andrew is lying.

52.     Shortly after MANN leaves, Andrew attempts to get out of bed, probably to retrieve the food. However, he is unable to stand up.

53.     Starting at approximately 8:00 a.m., Defendants MANN and JAMES pass out medications to inmates housed in the maximum-security cells. On information

and belief, the general protocol is for inmates to come to the door when called to receive their medications.

54.     When MANN arrives at Andrew's cell, Andrew cannot get out of bed to walk to the door. MANN recognizes this and enters Andrew's cell to speak with him. On information and belief, Andrew told MANN that he, Andrew, could not stand up to receive his medications, nor could he walk to get himself any water from the small sink on the other side of the cell.

55.     Around this time, Defendant JAMES arrives at Andrew's cell, and on information and belief MANN tells JAMES that Andrew cannot stand up or walk to receive his medication.  JAMES and MANN hold the door open to Andrew's cell while an inmate trustee retrieves a cup to use to provide Andrew some water to take his medications.

56.     While JAMES watches from the doorway, MANN enters Andrew's cell and fills the cup with water from the sink.

57.     MANN then goes to Andrew in the bed, where Andrew has managed to push himself up to a seated position. Andrew's body and hands are shaking so badly that MANN has difficulty placing the pills in Andrew's hand. Andrew then drops two of the pills, which MANN has to pick up for him.

58.     After Andrew takes the pills, he hands the cup of water back to MANN, who places it on the table on his way out of the cell. However, Andrew asks him for another drink of water, and MANN brings the cup back to him in the bed. These actions show that MANN and JAMES, who was watching the interaction, were aware that Andrew could not walk even a few feet to get himself a drink of water.

59.     After MANN places the cup back on the table, MANN and JAMES leave and lock the cell.

60.     At approximately 8:30 a.m., Andrew starts to attempt to get his food from the table across from the bed. Naked and unable to walk, he manages to throw his blanket on to the ground, and then lowers himself to sit on it.  He then drags himself across the floor of his cell on his buttocks.  When he gets to the table, he reaches up to take the container of food, but his hands are shaking so badly he cannot hold on to the container. He therefore tries to throw the container over to the bed, but it hits one of his jail-issued slippers and the contents spill on to the floor.

61.     Andrew then struggles around on the floor, trying to make it back to the bed. However, every time he tries to sit up, he falls back on to his back. It is obvious that he cannot control his body and is in the midst of a medical emergency.

62.     Eventually, and with great effort, Andrew is able to drag himself back on to the bed. He lies on his stomach and tries to eat a few bites of food off the floor.

63.     At approximately 8:40 a.m., Defendant DENNIS opens the cell door and observes Andrew lying naked on his bed trying to eat his food off the floor. It is obvious that something is seriously wrong with Andrew. However, DENNIS simply closes the door and locks the cell again, and he does not request any medical assistance.

64.     For approximately the next ten to twelve minutes, Andrew attempts to put his jail jumpsuit back on. However, he is unable to do so because of his condition. Eventually he gives up and just drapes the jumpsuit across his body, and then manages to pull the blanket over himself. His hands and body are still shaking throughout this process.

65.     Andrew lies down after managing to put the blanket over himself. There are spastic motions for the next hour and a half.

66.     Andrew's last movement occurs at 10:53 a.m., and it is believed he died sometime after that point.

ECF Doc. 52.

The FAC further alleges that Defendant Coleman, who was assigned to the Control Room, saw these events occur via the video surveillance feed from Andrew's cell. However, despite her awareness of Andrew's obvious medical emergency, Coleman did nothing to help him:

68.     Defendant MEKEDES COLEMAN was assigned to the Detention Center Control Room on the morning of January 9, 2021, where one of her jobs was to monitor the continuous video surveillance feed coming from Andrew's cell. On information and belief, COLEMAN observed Andrew's obvious medical distress via the surveillance video coming from Andrew's cell. However, COLEMAN took no action to obtain medical help for Andrew despite her awareness of his obvious and serious medical distress. . . .

ECF Doc. 52.

The FAC also alleges:

72.     Moreover, independent of the ultimate cause of death, the failure of Defendants MANN, JAMES, DENNIS and/or COLEMAN to report Andrew's

condition on the morning of January 9, 2021, and to take steps that would have led to medical treatment, including transport to the emergency room of a hospital, caused or contributed to his death.  Andrew's life would have been saved had he been promptly transported that morning to an emergency room for lifesaving treatment.

ECF Doc. 52.

## II.   LAW AND ARGUMENT

**When the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs, e.g., food, clothing, shelter, medical care, and reasonable safety, it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.  The affirmative duty to protect arises . . . from the limitation which [the State] has imposed on his freedom to act on his own behalf.**

*Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996).

As alleged in the FAC, and as the surveillance footage shows, the medical emergency of Andrew Jones was obvious and apparent.  His uncontrollable shaking, weakness, and inability to stand, walk, or control his body movements all show that he was in a medical crisis.  Yet, despite her awareness of his condition, Coleman did nothing to help Andrew Jones, not even alert a supervisor, much less call for medical assistance like she should have.  Such complete inaction in the face of an inmate's obvious medical crisis violates clearly established law.  Accordingly, Coleman's Motion to Dismiss based on qualified immunity should be denied.

### A.   Standard for Rule 12(b)(6) Motions to Dismiss

In considering motions to dismiss under Rule 12(b)(6), all well-pleaded facts must be taken as true and viewed in the light most favorable to the plaintiff.  *Hale v. King*, 642 F.3d 492, 498-99 (5th Cir. 2011) (en banc).  Plaintiffs must only allege facts that support the elements of the cause of action to make out a valid claim.  *Id*.  Courts generally confine their analysis under Rule 12(b)(6) to the complaint and its proper attachments, which "must contain sufficient factual

matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  The well-pleaded facts must permit the court to infer more than the mere possibility of misconduct.  *Id.*  Even if a plaintiff's complaint is found deficient under Rule 12(b)(6), the proper remedy is usually to allow the plaintiff to amend the complaint to cure any deficiencies, rather than to dismiss with prejudice.  *Public Health Equip. & Supply Co. v. Clarke Mosquito Control Equip., Inc.*, 410 Fed. Appx. 738, 740 (5th Cir. 2010) (finding that district court erred in denying plaintiff's motion to amend complaint after dismissal under Rule 12(b)(6)).

**B.  Coleman's Motion should be denied because the doctrine of qualified immunity is contrary to the Notwithstanding Clause of the original text of § 1983.**

New scholarship has revealed that the original text of § 1983[1], as enacted in 1871, contained a "Notwithstanding Clause" that apparently abrogated common-law immunities. *See generally* Professor Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101, 166-67.  As Professor Reinert explains, this Notwithstanding Clause was mysteriously omitted during a subsequent revision and compilation of the U.S. Code in 1874. Because the project of revising the Code was not intended to change the substance of any laws, and Congress never formally amended § 1983 to delete the Notwithstanding Clause, there is a persuasive argument that the doctrine of qualified immunity—founded on the assumption that Congress intended to incorporate common-law immunities into § 1983—has been in error since its inception.  Judge Willett of the Fifth Circuit recently described these "game-changing"

---

[1] Section 1983 was originally located in the U.S. Statutes at Large of 1871-1873, ch. 22, § 1, 17 Stat. 13.  It then moved to Section 1979 of the U.S. Revised Statutes (1878), then again to 8 U.S.C. § 43 (1925), and finally to 42 U.S.C. § 1983 (1952). This brief uses "Section 1983" to include this entire history.

arguments in his concurrence in *Rogers v. Jarrett*, 63 F.4th 971, 979-981 (5th Cir. 2023) (Willett, J., concurring).  Although the Plaintiff recognizes that only the Supreme Court can change the law of qualified immunity, he submits this argument to preserve his right to appellate review of this issue.

The doctrine of qualified immunity originated in 1967, when the Supreme Court held that Congress intended to retain common-law principles in actions under § 1983.  *Pierson v. Ray*, 386 U.S. 547, 557 (1967) ("We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983").  In *Pierson,* the Supreme Court reviewed the version of § 1983 found in the U.S. Code and concluded that the "legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities."  *Id*. at 554.  Accordingly, the Court granted defendants a "defense of good faith and probable cause" like they would have had at common law.  *Id*. at 557.

The incorporation of common law defenses into § 1983 eventually evolved into the modern doctrine of qualified immunity.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 806-807 (1982) ("As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability.").  With each step along the path of qualified immunity, the Supreme Court has explicitly relied on the supposed silence of § 1983 with respect to the abolition of common-law defenses to ground the doctrine.  *See, e.g., Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (holding that "[c]ertain immunities were so well established in 1871" that "Congress would have specifically . . . provided had it wished to abolish them."); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989) (relying on the presumption that the 42nd Congress "likely intended" for the common law

to apply); *Briscoe v. Lahue*, 460 U.S. 325, 337 (1983) ("[W]e find no evidence that Congress intended to abrogate the traditional common-law witness immunity in § 1983 actions.").

However, the whole artifice of qualified immunity may have been founded on what amounts to a scrivener's error. The Supreme Court has always relied on the version of § 1983 that is contained in the U.S. Code, which was not compiled until three years after the passage of § 1983 in 1871. The Court has never examined the actual text of the law that was originally passed by Congress as part of the Ku Klux Klan Act of 1871. And that original text, as contained in the United States Statutes at Large, contains the Notwithstanding Clause that shows that Congress ***did*** in fact intend to abolish common-law immunities when it came to § 1983. Specifically, the original text of § 1983, with the Notwithstanding Clause in bold, reads as follows:

> That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, **any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding**, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress[.]

*See* Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. at 166-67 (quoting the Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871)) (emphasis added). The Notwithstanding Clause can also be seen in a copy of the Civil Rights Act of 1871 from the National Archives and Records Administration:

Forty-second

# Congress of the United States, At the First Session,

Begun and held at the CITY OF WASHINGTON, in the DISTRICT OF COLUMBIA, on Saturday, the fourth day of March, eighteen hundred and seventy-one.

## AN ACT

to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes.

Be it Enacted, by the Senate and House of Representatives of the United States of America in Congress assembled, That any person who, under color of any law, statute, ordinance, regulation, custom, or usage, of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled "An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication," and the other remedial laws of the United States which are in their nature applicable in such case.

Sec. 2. That if two or more persons within any State or Territory of the United States shall conspire together to overthrow, or to put down, or to destroy by force the Government of the United States, or to levy war against the United States, or to oppose by force the authority of the Government of the United States, or by force,

To determine the meaning of this long-forgotten Notwithstanding Clause, this Court should look to the "ordinary public meaning" of the clause "at the time of its enactment." *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020).  Accordingly, the Court should evaluate two key phrases: (1) "custom[ ] or usage of the State," and (2) "to the contrary notwithstanding."

As understood by the 42nd Congress, a "usage or custom" was the common law itself. *Strother v. Lucas*, 37 U.S. 410, 437 (1838).  Whether a rule was established by "usage" or through "custom," it existed by "a common right, which means a right by common law."  *Id.  See also Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 659 (1834) ("The judicial decisions, the usages and customs of the respective states" established the "common law . . . in each [state]."); *Western Union Telegraph Co. v. Call Pub. Co.,* 181 U.S. 92, 102 (1901) (citing Black's Law Dictionary for proposition that common law springs from "usages and customs").[2]

The original text of Section 1983 also said that officials will be liable for constitutional violations "notwithstanding" any common-law principles to the "contrary."  The ordinary public meaning of "notwithstanding" remains that same today as it did for the 42nd Congress in 1871. *See Bryan A. Garner, Garner's Modern English Usage* 635 (4th ed. 2016) ("This usage [of notwithstanding] has been constant from the 1300s to the present day.").  "Notwithstanding" means "[w]ithout opposition, prevention, or obstruction from," or "in spite of."  Complete Dictionary of the English Language 894 (Webster's 1886)[3]; *NLRB v. SW Gen., Inc*., 137 S. Ct. 929, 939 (2017) (explaining that the ordinary meaning of "notwithstanding" is "in spite of" or

---

[2] The legislative history of Section 1983 confirms this common understanding of "custom and usage" from 1871. For example, "Senator Thurman, speaking in opposition to Section 1 of the 1871 Act (what is now Section 1983), clearly understood that 'custom or usage' was equivalent to 'common law.'" *Reinert*, 111 Calif. L. Rev. at 167.

[3] Available online at https://archive.org/details/websterscomplete00webs/page/894/mode/2up?view=theater

"without prevention or obstruction from or by").  Many contemporaneous dictionaries confirm this meaning.  *See, e.g., Etymological Dictionary of the English Language* 344 (Chambers's 1874) ("not standing against or opposing; nevertheless.");[4] 2 A New Dictionary of the English Language 1351 (1837) ("Not opposing, resisting, hindering, preventing.").[5]  This plain-English understanding of the "notwithstanding clause" is consistent with the context.

In short: the Notwithstanding Clause means that common-law immunity doctrines do not prevent persons from being held liable under § 1983.  *See* Reinhart, 111 Calif. L. Rev. at 167–68 ("Its implications are unambiguous: state law immunity doctrine, however framed, has no place in Section 1983.").

The question, then, is what happened to this original language?  Why does it not appear in the U.S. Code?  The answer appears to be that it was simply left out during a subsequent technical revision and compilation of U.S. laws, one which was not supposed to change the substance of any law.  As Judge Willett describes in *Rogers*:

> "For reasons lost to history, the critical "Notwithstanding Clause" was inexplicably omitted from the first compilation of federal law in 1874.  The Reviser of Federal Statutes made an unauthorized alteration to Congress's language. And that error was compounded when the various revised statutes were later published in the first United States Code in 1926.  The Reviser's error, whether one of omission or commission, has never been corrected."

*Rogers*, 63 F.4th at 980

But that historical error does not change what the text of § 1983 actually says.  Only Congress can do that.  And the fact is, Congress has never passed a law amending § 1983 to remove the Notwithstanding Clause.  In determining what a law says, it is the original Statutes at Large that provides the actual "legal evidence of laws."  *U.S. Nat'l Bank of Or. v. Indep. Ins.*

---

[4] Available online at https://i2i.org/wp-content/uploads/2017/11/1874_Chambers_Etymological.pdf

[5] Available online at https://babel.hathitrust.org/cgi/pt?id=chi.73004154&view=1up&seq=175

*Agents of Am., Inc.,* 508 U.S. 439, 448 (1993), *citing* 1 U. S. C. § 204(a).  *See also United States v. Welden*, 377 U.S. 95, 98 n.4 (1964) ("the Code cannot prevail over the Statutes at Large when the two are inconsistent.") (quoting *Stephan v. United States*, 319 U.S. 423, 426 (1943)).

The Notwithstanding Clause shows that the 1871 Congress explicitly decided that persons can be held liable for § 1983 violations despite any common-law doctrines to the contrary.  The omission of that language in 1874 did not change the law.  Because the doctrine of qualified immunity rests on the incorrect presumption that the 1871 statute was silent about the common law, the doctrine should be rejected in § 1983 cases as Congress originally intended.

### C.    <u>Subjective vs. Objective Deliberate Indifference</u>

There is another issue the Plaintiff must preserve for appellate review.  Coleman's Motion asserts that the Plaintiff's § 1983 claim should be evaluated under the subjective deliberate indifference test set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994).  Under the *Farmer* test, a defendant is liable under § 1983 where she "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.  The Plaintiff acknowledges that is currently the law in the Fifth Circuit.  *Cope v. Cogdill*, 3 F.4th 198, 207 n. 7 (5th Cir. 2021).  However, the Plaintiff submits that because Andrew Jones was a pretrial detainee rather than a convicted prisoner, the appropriate standard to apply is objective deliberate indifference pursuant to *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2470–71, 192 L.Ed.2d 416 (2015).  Objective deliberate indifference exists where Defendants knew or **should have known** that a particular action or inaction would violate the plaintiff's rights.  The *Kingsley* standard has been analogized to a civil recklessness standard, "which would not require proof of an official's actual awareness of the harms associated with the challenged conditions…".  *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (emphasis added).

Although *Kingsley* involved an excessive force allegation, the Plaintiff submits that it abrogated Fifth Circuit case law such that the objective standard should apply in all § 1983 cases involving pretrial detainees. The Second, Sixth, Seventh, and Ninth Circuits have so held, and the Plaintiff submits that their analyses on the issue are persuasive and should be applied in this case. *See Brawner v. Scott*, 14 F.4th 585 (6th Cir. 2021); *Miranda v. City of Lake*, 900 F.3d 335 (7th Cir. 2018); *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017); *Castro v. City of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). However, the Plaintiff acknowledges that the Fifth Circuit disagrees with this proposition. *Cope*, 3 F.4th at 207 n. 7 (rejecting proposition that *Kingsley* abrogated circuit precedent with respect to § 1983 medical claims).

### D. Coleman's Motion should be denied because the FAC alleges she did *nothing* to help Andrew Jones despite her awareness of his obvious medical emergency.

Regardless of the standard applied, Coleman's Motion should be denied because it was clearly established law that a guard cannot decide to do ***nothing*** in the face of an inmate's obvious medical emergency. That is what the FAC alleges Coleman (and Mann and James and Dennis) did on the morning of January 9, 2021. Accordingly, Coleman is liable under § 1983 for the wrongful death of Andrew Jones.

Although the standard is high, qualified immunity is not a talismanic, insurmountable defense. Instead, to overcome the defense at the pleading stage, a plaintiff must allege facts that, taken in the light most favorable to the plaintiff, would establish that the defendant violated a clearly established right in such a way that caused injury to the plaintiff. *Backe v. Leblanc*, 691 F.3d 645, 648 (5th Cir. 2012).

A right is "clearly established" if it is "one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577

U.S. 7, 11 (2015) (per curiam) (internal quotation marks and citation omitted).  Courts must not "define clearly established law at a high level of generality"; instead, their "inquiry must be undertaken in light of the specific context of the case." *Id*. at 12.  Generally, to satisfy this standard, there must be "controlling authority—or a robust consensus of persuasive authority— that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371- 72 (5th Cir. 2011) (en banc) (internal quotation marks and footnote omitted).  However, where the defendant's conduct is extreme and obviously unlawful, an analogous case is not required. *Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020).  *See also Joseph,* 981 F.3d at 330 (explaining that Supreme Court precedents allow for "rare possibility that, in an obvious case, analogous case law is not needed because the unlawfulness of the challenged conduct is sufficiently clear") (cleaned up).  "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave **reasonable warning** that the conduct then at issue violated constitutional rights." *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006) (emphasis added) (quoting *Hope v. Pelzer,* 536 U.S. 730, 740 (2002)).

Considering the specific factual context of this case, the right at issue is:  Whether it violates the Fourteenth Amendment for an officer to ignore and do nothing when she observes an inmate, with no one present to help him, exhibit symptoms of an obvious medical emergency: uncontrollable shaking, extreme weakness, and an inability to walk or control his body.  The law was clearly established on January 9, 2021, that such inaction violates the constitution.

As a pretrial detainee, Andrew Jones had a clearly established right "not to have [his] serious medical needs met with deliberate indifference on the part of the confining officials." *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Thompson v. Upshur Cty,Tex.*, 245

F.3d 457 (5th Cir. 2001)).  To succeed on a deliberate-indifference claim, a plaintiff must show that (1) the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) the official actually drew that inference.  *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001) (quoting *Farmer*, 511 U.S. at 837).  A plaintiff establishes a constitutional violation by showing that a jail official "**refused to treat him,** ignored his complaints, intentionally treated him incorrectly, or **engaged in any similar conduct** that would clearly evince a wanton disregard for any serious medical needs." *Easter*, 467 F.3d at 465 (5th Cir. 2006) (quoting *Domino*, 239 F.3d at 756) (emphasis added). *See also Delaughter v. Woodall*, 909 F.3d 130, 140 (5th Cir. 2018) ("[I]t is clearly established that delaying medical care can constitute [deliberate indifference] if the prion official 'knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it,' and the delay results in substantial harm.").

In this case, the Plaintiff's FAC alleges Coleman watched the surveillance video showing Andrew's serious medical symptoms.  Because the video shows obvious medical distress, Coleman's subjective knowledge of the risk of harm can plausibly be inferred from the circumstances.  *Easter*, 467 F.3d at 463.  As the Supreme Court explained in *Farmer*:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, **and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.**

*Farmer*, 511 U.S. at 842 (citations and quotations omitted).

A sudden inability to walk or control one's body, accompanied by extreme weakness and shaking, is an obvious medical emergency that even a layperson can recognize.  Numerous courts have acknowledged this fact.  *Howell v. NaphCare, Inc.,* 67 F.4th 302, 312 (6th Cir. 2023)

16

(medical emergency obvious when decedent "fell to the ground, seemingly unable to walk under his own power"); *Barton v. Taber,* 820 F.3d 958, 965 (8th Cir. 2016) (concluding that there was an objectively serious medical need where the deceased fell over, could not walk on his own, could not answer questions and became unresponsive); *Vogt v. Crow Wing Cty.,* No. 0:21-cv-1055 (D. Minn. Nov. 11, 2021), 2021 WL 6275271, at *4-5 (medical emergency obvious when inmate was shaking, sweating, and unable to walk); *Jones v. Book*, No. 1:11–CV–02150 (W.D. La. Dec. 28, 2012), 2012 WL 7008160 at *4 (report and recommendation adopted at *Jones v. Book*, 2013 WL 450089) (holding that inability to walk was serious medical symptom); *Coats v. Pope*, No. 1:17-cv-02930 (D.S.C. Oct. 30, 2019), 2019 WL 5586871, at *7 (finding plaintiff had stated deliberate indifference claim where correctional officers delayed calling for medical assistance for 43 minutes while prisoner was "sweating and breathing heavily, vomiting, incapable of speaking, standing or walking, and having seizures"); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 652 (E.D. Va. 2004) (finding triable issue of deliberate indifference where prisoner was suffering from "heavy sweating, vomiting, incoheren[t], and [unable] to walk" but patrolling guards "took virtually no action in response"); *Pettus v. Hill*, No. 5-B-2496 (N.D. Al. May 19, 2006), 2006 WL 8437974, at *2 (denying qualified immunity on deliberate indifference claim where plaintiff alleged defendant knew plaintiff was so ill he was unable to walk but did not provide appropriate aid).

Furthermore, Fifth Circuit case law is clear that total inaction in the face of an inmate's obvious medical emergency violates clearly established law. In *Dyer v. Houston*, for example, the Fifth Circuit denied qualified immunity to three police officers who had seen the decedent, who was under the influence of drugs, banging his head repeatedly against the inside of the patrol car on the way to the jail. Despite the defendants' knowledge of these actions and the

risks of harm they posed, the defendants failed to advise jailers of what had happened or to seek medical care for the injuries.  The Fifth Circuit held that this inaction in the face of an obvious and known risk of harm was a violation of clearly established rights.  *Dyer*, 964 F.3d at 384-85 (holding that officers were not entitled to qualified immunity on deliberate indifference claim because they were on "fair warning" that their behavior was unlawful; "despite being aware of the detainee's dire condition[,] ... [they] did nothing to secure medical help").

Similarly, in *Thompson v. Upshur County, Tex.,* the Fifth Circuit denied qualified immunity to a guard who was aware the plaintiff had elevated blood-alcohol content and had begun "to collide with objects in his cell, sometimes falling and striking his head against the window, floor, or concrete bench."  245 F.3d at 454.  Despite this knowledge, the guard ordered others not to take the inmate to the hospital without her permission.  She then left the jail and told subordinates not to call her at home unless the inmate was "dying."  In denying the guard's motion for summary judgment based on qualified immunity, the Court ruled that it was clearly established law that jailers could not impose "a significantly exacerbating delay or a denial of medical care to a detainee suffering from DTs."  *Id*. at 463.

In *Easter v. Powell*, the Fifth Circuit held that a prison nurse was deliberately indifferent where she delayed providing heart medications to an inmate with a history of heart problems who was showing obvious signs of a heart attack.  The Court noted that the delay in treatment was not due to any medical judgment.  Instead, it was because the prison pharmacy was closed. The Court concluded that the nurse's conduct was objectively unreasonable in light of clearly established law.  Accordingly, it denied her request for qualified immunity.  *Easter*, 467 F.3d at 465.

In *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003), the Fifth Circuit held that it violated clearly established law for officials to delay calling for medical care for nearly two hours after a young bootcamp participant vomited and lost consciousness. *See also Rodrigue v. Grayson*, 557 Fed. Appx. 341, 347 (5th Cir. 2014) (denying qualified immunity where defendants knew of signs and symptoms of serious medical condition but simply ignored it).

There is also a robust consensus of persuasive authority from other circuits holding that inaction or unjustified delay in responding to an obvious medical emergency violates clearly established law. In *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004), for example, the Sixth Circuit held that it violated an inmate's clearly establish rights for jailers to ignore for two days his reports and symptoms of severe abdominal issues, which turned out to be appendicitis. The Court held:

> Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise. This violation is not premised upon the "detrimental effect" of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm. **When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity.**

*Id.* at 899 (emphasis added).

Similarly, in *Fields v. Corizon Health, Inc.*, 490 Fed. Appx. 174 (11th Cir. 2012), the Eleventh Circuit considered a case in which an inmate had become partially paralyzed and unable to walk. Despite defendants' awareness of his condition, they did nothing to help him for over 24 hours. At trial of the case, doctors testified that "any form of paralysis, partial or total, **or weakness of the legs** constituted a medical emergency." *Id.* at 183 (emphasis added). The Circuit concluded that the plaintiff's symptoms were so "uncommon, serious, and traumatic . . . that even someone without any medical training would have recognized the situation as requiring

immediate care by a doctor." *Id*. at 184.  The defendants' delay in responding to the situation violated clearly established rights.  *See also Lopez v. Swaney*, 741 Fed. Appx. 486, 487 (9th Cir. 2018) ("The denial of medical care in the face of an obvious emergency constitutes deliberate indifference.");  *Kellum v. Mares*, 657 Fed. Appx. 763, 770 (10th Cir. 2016) (holding that it was deliberate indifference for nurse to delay treatment despite knowing symptoms of medical emergency, including inability to stand or walk); *Hunt v. Dental Dep't.*, 865 F.2d 198, 201 (9th Cir. 1989) (holding that prison official acts with deliberate indifference when official denies medical care to prisoner exhibiting serious symptoms of pain or disease); *Boley v. Armor Corr. Health Servs., Inc.*, No. 2:21-CV-197 (E.D. Va. Mar. 28, 2022), 2022 WL 905219, at *6 (collecting cases holding that "[a] correctional officer's refusal to call for medical staff is usually sufficient, at the motion to dismiss stage, to sustain a claim that the officer was personally involved in the denial of treatment or deliberately interfered with treatment.").

Although the various symptoms and causes of medical distress may have differed in these cases, the controlling theme is that jail officials—especially those like guards who act as "gatekeepers" to qualified medical professionals—cannot simply ignore or disregard signs of an inmate's obvious medical emergency.  *Domino*, 239 F.3d at 756 (holding that officials cannot refuse to treat or ignore signs and symptoms of medical problems).  *See also Rodrigue v. Morehouse Detention Ctr.*, No. 09–985 (W.D. La. Sept. 28, 2012), 2012 WL 4483438, at *6, affirmed sub nom *Rodrigue v. Grayson*, 557 Fed. Appx. 341, 347 (5th Cir. 2014) (holding that "gatekeepers" to qualified medical personnel cannot ignore medical complaints).  "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. . . . [T]he salient question . . . is whether the state of the law . . . gave respondents fair warning that their alleged treatment . . . was unconstitutional."  *Hope v. Pelzer*, 536 U.S.

730, 741 (2002).  In this case, the Plaintiff has alleged that Coleman was aware of Andrew's obvious and extreme medical emergency, which resulted in his death.  However, she took **no action** in response to that knowledge.  That inaction was objectively unreasonable under clearly established law.

        E.       **Coleman's arguments to the contrary are unpersuasive.**

The argument's advanced in Coleman's Motion do not change this analysis.  First, this case is distinguishable from the cases cited in Coleman's brief, each of which involved officers who took at least some action in response to medical emergencies.  In *Cope v. Cogdill*, 3 F.4th 198, 209-10 (5th Cir. 2021), the jailer followed the jail's protocols when he contacted his supervisor after observing an inmate attempting to hang himself with a phone cord.  Although the Fifth Circuit ruled that the jailer also should have called emergency services in response to the situation, it went on to hold that the law was not clearly established on that point at the time.  However, it was critical for the Court's analysis that the jailer did *something* in response to the emergency.  *Id.*  That is what distinguished the case from *Dyer*.  *Id.* at 209.  As the Fifth Circuit explained*:*

> We concluded [in *Dyer*] that existing precedent showed that officers who, "despite being aware of the detainee's dire condition[,] . . . did nothing to secure medical help" at all were on "fair warning" that their behavior was deliberately indifferent.  [964 F.3d at] 384-85 (internal quotation marks and citation omitted).  Here, in contrast, Laws did something: he called Brixey for assistance and she called 911, albeit not as promptly as should have been done.

3 F.4th at 209.  In other words, as the Fifth Circuit recognized in *Cope,* even though the law was **not** clearly established in cases where the defendant did **something** to try to help, the law regarding those who "despite being aware of the detainee's dire condition . . . did **nothing** to secure medical help," **was** clearly established.  Here, the FAC alleges Coleman did nothing in

response to the obvious medical emergency.  This case is therefore like *Dyer*, not *Cope*, and qualified immunity does not apply.

Similarly, in *Reed v. Nacogdoches Cty.*, 2023 WL 3563017 (5th Cir. 2023), the Court held that a guard was entitled to qualified immunity after she ignored an emergency intercom for three minutes while making a personal phone call.  Again, the facts of this case are readily distinguishable.  In *Reed*, the Court noted that the guard did not know there was a medical emergency because she ignored only the intercom, which only *might* have been alerting to an actual emergency.  *Id*. at *4.  In this case, the allegation is that Coleman watched with her own eyes the medical emergency unfolding, and so there is no question she knew about it.  Furthermore, Coleman did not just delay for three minutes— she *never* alerted *anyone* about Andrew's condition.  Again, this complete inaction in the face of a known medical emergency makes this case more like *Dyer*, *Thompson,* and *Easter* than *Reed.*

For these same reasons, *Aguirre v. City of San Antonio*, 995 F.3d 395 (5th Cir. 2021), is distinguishable from this case.  In *Aguirre*, the defendant-officers attempted CPR and other medical interventions once they realized the detainee was not breathing.  The Fifth Circuit held that these actions distinguished the situation from cases such as *Easter*, in which defendants did nothing in the face of a known medical emergency.  *Id.* at 421 ("This is not a case where the Officers elected to do nothing in response to a known health risk.").  Here, in contrast, this **is** a case where defendants did nothing in response to a known health risk.  *Aguirre* is therefore inapplicable.

Coleman also seems to suggest that she is entitled to qualified immunity because she could not be expected to recognize the symptoms Andrew exhibited were the result of his untreated HIV.  While it remains to be seen whether Coleman knew of Andrew's untreated HIV

status, the "relevant question is the *risk of substantial harm*, not whether a prison or jail official is aware of the specific medical condition causing an inmate's symptoms." *Kellum*, 657 Fed. Appx. at 770. This is shown by the Supreme Court's analysis in *Farmer*: "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial **risk** of serious damage to his future health." *Farmer*, 511 U.S. at 842 (emphasis added) (internal quotation marks omitted)). A plaintiff can show deliberate indifference by demonstrating that a prison official was aware of an obvious, substantial risk to a prisoner's safety even if the official "did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Id.* at 843. It is well established that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the **risk** was obvious." *Id.* at 842 (emphasis added). Here, it does not matter that Coleman may not have known the specific etiology of Andrew's symptoms, just as it did not matter in *Farmer* whether an official could identify a specific prisoner especially likely to harm the plaintiff. The Plaintiff can establish a violation by showing that Coleman was aware of an obvious, substantial **<u>risk</u>** to his safety, even if she "did not know that [Andrew] was especially likely to [die from] the specific [disease]" that eventually killed him. *Farmer*, 511 U.S. at 843. As alleged in the FAC, if Coleman had alerted someone after witnessing the terrible shape Andrew was in, Andrew could have been sent to the emergency room and his life likely could have been saved. ECF Doc. 52 at ¶ 72.

Finally, it should be noted that at page 9 of her brief Coleman misquotes the Fifth Circuit's decision in *Reed* in a way that makes the language seem broader (and more supportive of her argument) than it actually is. Her brief quotes *Reed* as follows: "And it's also not clear that every reasonable officer would conclude **<u>that misinterpreting inmate behavior</u>**—which

*might* be alerting to a medical emergency—is the same as an officer *knowing* for a fact that a

medical emergency is ongoing and not calling for emergency assistance like the officer in *Cope*."

However, the actual language from *Reed* is confined to the specific circumstances of that case,

which, as discussed above, are quite different from the circumstances present here:  "And it's

also not clear that every reasonable officer would conclude **that ignoring an emergency**

**intercom**—which *might* be alerting to a medical emergency—is the same as an officer *knowing*

for a fact that a medical emergency is ongoing and not calling for emergency assistance like the

officer in *Cope*."  *Reed*, 2023 WL 3563017, at *4.

     F.     <u>**The Plaintiff requests the opportunity to amend the complaint and submit**</u>
<u>**the video surveillance footage to the Court if necessary.**</u>

Obviously, the video surveillance footage showing Andrew's condition leading up to his

death is central to the Plaintiff's case and extensively referenced in his FAC.  If this Court

perceives any pleading deficiencies with the First Amended Complaint, the Plaintiff requests

leave to file an amendment to cure such deficiency, and specifically proposes that he can attach

the video footage as an exhibit to such amended complaint for the Court's review.  *See Griggs v.*

*Hinds Junior College*, 563 F.2d 179, 180 (5th Cir. 1977) ("Granting leave to amend is especially

appropriate, in cases such as this, when the trial court has dismissed the complaint for failure to

state a claim."); *Public Health Equip. & Supply Co. v. Clarke Mosquito Control Equip., Inc*., 410

Fed. Appx. 738, 740 (5th Cir. 2010) (finding that district court erred in denying plaintiff's

motion to amend complaint after dismissal under Rule 12(b)(6).

<u>**CONCLUSION**</u>

For the aforesaid reasons, the Plaintiff respectfully requests that the Court deny

Defendant Coleman's Motion to Dismiss based on qualified immunity, ECF Docs. 69, 70.

24

Respectfully submitted,

/s/ Stephen J. Haedicke (LA #30537)
Appearing Pro Hac Vice
Law Office of Stephen J. Haedicke, LLC
1040 Saint Ferdinand St.
New Orleans, LA 70117
(504)291-6990 Telephone
(504)291-6998 Fax
stephen@haedickelaw.com

/s/ Robert McDuff
Robert B. McDuff
Miss. Bar No. 2532
767 North Congress Street
Jackson MS 39202
601-259-8484
rbm@mcdufflaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing motion has been served upon all counsel of record via the Court's ECF/CMF system, which will send notice of filing to all counsel of record.

/s/ Stephen J. Haedicke