IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

CORBEY JONES; **ESTATE OF ANDREW**     *
**WESLEY JONES**,                        *
                                         *
Plaintiffs,                              *
                                         *
VERSUS                                   *     Civ. No. 2:22-CV-93-KS-MTP
                                         *
JONES COUNTY, MS; SHERIFF JOE            *
BERLIN, DEPUTY JAMES MANN, SGT.          *
JESSE JAMES, DEPUTY COLTON               *
DENNIS, CAROL JOHNSON; AND               *
DEPUTY MEKEDES COLEMAN.                  *
                                         *
Defendants.                              *
*****************************************

## [Proposed] SECOND AMENDED COMPLAINT [new portions in bold]

*Jury Trial Requested*

1.     This case involves the death of Andrew Wesley Jones, the Plaintiff's son, at the Jones

County Adult Detention Center.  As the evidence will show, the Defendants deliberately

ignored Andrew's serious medical conditions and refused to provide him desperately

needed medical treatment, both by failing to obtain and administer medications a doctor

had prescribed that would have saved his life and by failing to respond to his obvious

medical emergency on the day of his death.  These failures show the individual Defendants'

deliberate indifference to Andrew's critical medical needs while he was at the jail.

Furthermore, the evidence will show that these failures were the direct result of

unconstitutional and unlawful policies and practices at the Detention Center.  Jones County

and the individual defendants are therefore directly liable for the tragic and preventable

death of Andrew Jones.

## I.  JURISDICTION

2.      This action is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment

to the United States Constitution.  Jurisdiction is founded on 28 U.S.C. § 1331 and the

aforementioned statutory and constitutional provisions.

## II.  PARTIES

### (Plaintiffs)

3.      **CORBEY JONES** is an adult citizen of the United States and is domiciled in the

Southern District of Mississippi.  He is the natural father of Andrew Wesley Jones, who died

unmarried and without children.[1] **He brings this claim for the benefit of himself and all**

**parties concerned, specifically the siblings of Andrew Wesley Jones.   Those siblings**

**are Bethany Hinton, Cera Thompson, and Carey Jones.**

4.      **The ESTATE OF ANDREW WESLEY JONES is an estate of the deceased, Andrew**

**Wesley Jones, administered in Jones County, Mississippi, by CORBEY JONES.**

### (Defendants)

**Named defendants herein are:**

5.      **JONES COUNTY, MISSISSIPPI ("JONES COUNTY")**, is a political subdivision of the

State of Mississippi and is a legal entity capable of suing and being sued.

6.      **SHERIFF JOE BERLIN**, in his individual and official capacity as Sheriff of Jones

County, is an adult citizen of the State of Mississippi and domiciled in the Southern District

of Mississippi.  At all times described herein, he was the Sheriff of Jones County and, as

---

[1] Former plaintiff Cynthia Jones is now deceased.

such, was responsible for the hiring, training, supervision, discipline, and control of the deputies under his command as well as all medical personnel providing services in correctional facilities under his control. He was responsible for all actions of staff and employees of the Jones County Sheriff's Department. He was also responsible for the supervision, administration, policies, practices, customs, and operations of the Jones County Adult Detention Center ("Detention Center" or "the Jail"). He was also responsible for ensuring appropriate access to services and accommodations for all individuals with disabilities as defined by the ADA who were incarcerated at the Detention Center. He was and is a final policy maker. He is liable both directly and vicariously for the actions complained of herein.

7.      **JANET HENDERSON** (hereinafter **"HENDERSON"**) is an adult citizen of the United States and, on information and belief, was previously domiciled in the Southern District of Mississippi. At all times described herein, **HENDERSON** was the Warden of the Jones County Adult Detention Center and an employee of **SHERIFF BERLIN**. As such, she was responsible for the supervision, administration, policies, practices, customs, training, and operations of the Detention Center and its personnel, including but not limited to the provision of medical care to inmates at the Detention Center. She was also responsible for ensuring appropriate access to services and accommodations for all individuals with disabilities as defined by the ADA who were incarcerated at the Detention Center. She was a final policymaker and was acting under color of law at all relevant times. She is liable both directly and as a supervisor for the actions complained of herein. She is sued in her individual capacity.

8.      **JONES COUNTY DEPUTIES JAMES MANN, SGT. JESSE JAMES, COLTON DENNIS**, and **MEKEDES COLEMAN**, in their individual capacities as current or former Jones County

Sheriff's Deputies, are adult citizens of the State of Mississippi and, on information and belief, are domiciled in the Southern District of Mississippi. At all pertinent times, these Defendants were employed by Sheriff **JOE BERLIN** and/or **JONES COUNTY** as correctional officers assigned to the Jones County Adult Detention Center. At all relevant times, these Defendants were acting under color of law and in the course and scope of their employment.

9.      **PATRICIA CAROL JOHNSTON,** in her individual capacity, is an adult citizen of the State of Mississippi and, on information and belief, is domiciled in the Southern District of Mississippi. At all relevant times, Defendant **JOHNSTON**, who is a Licensed Practical Nurse (LPN), was employed by **JONES CONTY** and/or **SHERIFF JOE BERLIN** to provide medical care to inmates at the Jones County Adult Detention Center. She was acting under color of law in the course and scope of that employment at all relevant times. She was a final policymaker with respect to medical care and medication at the Detention Center.

### III.  FACTUAL ALLEGATIONS

10.      Suffering under the pressures of the pandemic, Andrew Wesley Jones, the Plaintiff's thirty-four-year-old son, began to have severe mental and emotional difficulties during the summer of 2020. Although Andrew had struggled with drug addiction issues in the past, and these had gotten worse after his fiancée committed suicide, he was a valued member of the community. He worked as a high school cheerleading teacher and coach, and he was loved and respected by his students and community. He was also loved by his family.

11.      In September 2020, Andrew started to exhibit symptoms of psychosis, which prompted his parents to take him to the hospital. Andrew was ultimately referred to a psychiatric crisis stabilization facility and then to inpatient addiction treatment and

psychiatric facilities.  Andrew was diagnosed with bipolar disorder, depression, anxiety, drug addiction, and post-traumatic stress disorder at these facilities.  He started a course of intensive treatment and, after some months, he started to stabilize on medications and his condition was improving.

12.     Based on a test conducted in late October 2020, Andrew was diagnosed as positive for HIV on November 5, 2020, while he was at one of the in-patient treatment centers. Andrew had tested negative for HIV some months prior, meaning that the exposure and infection had occurred relatively recently.

13.     On or about November 23, 2020, Andrew tested positive for COVID at the in-patient treatment facility where he was residing.  Because of the positive test result, and for the safety of other patients, Andrew was sent home to quarantine.

14.     Andrew returned to living with his parents after the positive COVID test. Unfortunately, shortly after Andrew returned home his father, the Plaintiff Corbey Jones, became sick with the COVID virus.

15.     Shortly after testing positive for COVID, Corbey Jones was admitted to the hospital. Within hours of his hospital admission, the doctors recommended that he be placed on a ventilator.  Mr. Jones would remain sedated and on the ventilator for the next sixty (60) days.  By the time he regained consciousness, his son Andrew would be dead.

16.     Blaming himself for his father's infection, Andrew succumbed to his addictions and started using drugs and alcohol again.  On December 9, 2020, it is believed he became intoxicated and wandered into the house of a Jones County Sheriff's Deputy.  The Deputy saw him walking out of the house and arrested him on a felony burglary charge.

17.     Andrew was booked into the Jones County Adult Detention Center (the "Detention Center" or "the Jail").

18.     During the booking process, Andrew reported to the intake deputy that he suffered from high blood pressure, HIV, and psychiatric problems.  In response to a question about suicidal thoughts, Andrew reported that he was currently thinking about suicide and had attempted suicide in the past.

19.     The intake deputy did not document any physiological or neurological symptoms at the time of Andrew's booking on December 9, 2020.

20.     During the relevant period, Defendant **JOHNSTON**, a Licensed Practical Nurse**,** was employed by Defendants **JONES COUNTY** and **SHERIFF BERLIN** to provide medical care to inmates at the Detention Center.  Defendant **JOHNSTON** was a full-time licensed practical nurse and was the only medical staff member employed at the Detention Center.  At the time, the only other medical care for inmates was provided by a Nurse Practitioner working on a contract who generally came to the jail one time per week to conduct a clinic for inmates who had requested to see him.  Defendant **JOHNSTON** created the list of inmates the Nurse Practitioner would see.  She was also the sole person in charge of acquiring and providing medications to inmates who needed them and for arranging for inmates to see outside medical providers when necessary.

21.     Mississippi licensure requirements provide that a Licensed Practical Nurse must be supervised by either an RN or a doctor when providing medical care.  However, no qualified medical professional supervised Defendant **JOHNSTON** as she was providing medical care to inmates at the Detention Center.

22.     Although Andrew told the intake booking officer that he had recently tested negative for COVID, and although Andrew was not tested for COVID at the jail, Andrew was placed in a maximum-security segregation cell by himself when he was booked because he previously had COVID.  He stayed there during the month he was detained even though he should not have been there and should have been transferred out.  The conditions in that isolation cell were significantly worse than in general population.

23.     Before he was arrested, an appointment had been scheduled for Andrew at the Hattiesburg Clinic for December 18, 2020, to see an infectious disease specialist for treatment of his HIV.

24.     Defendant **JOHNSTON** was aware that Andrew was HIV positive.  On information and belief, Warden **HENDERSON** and other jail staff were also aware that Andrew was HIV positive.

25.     **JOHNSTON** knew that the December 18th appointment was for Andrew to see a doctor to obtain treatment for HIV.  She gave approval for Andrew to be transported to this appointment.

26.     Andrew had been a patient at the Hattiesburg Clinic for many years.  He had a history of anxiety, depression, skin ailments, and hypertension.  The physician noted that Andrew had tested negative for HIV about two months prior but was now positive.  Andrew also reported lesions on his left thigh.  The physician noted that Andrew wanted to start medication for HIV.  The physician ordered labs and prescribed Andrew two medications used to treat HIV (Descovy and Tivicay).

27.     The lab results showed that Andrew's HIV viral count was extremely high.  This condition, called HIV viremia, is life-threatening.  However, modern antiretroviral HIV

medications like Descovy and Tivicay are extremely effective in quickly reducing patients' viral loads.  Improvement in a HIV patient's condition can occur in less than two weeks once they start on these medications.  It is therefore extremely important that HIV positive patients receive their antiretroviral medications as soon as possible.

28.     At the time of this case, the policy and practice at the Detention Center was that **JOHNSTON** would not request medical records to be sent to her after an inmate attended a medical appointment with an outside provider.  The Detention Center would therefore not provide inmates who had seen such outside providers with any medications that the providers may have prescribed for them at the appointment.  Instead, it was left to the family members of the incarcerated person to obtain any medications that had been prescribed and bring them to the jail.

29.     It was also the policy and practice at the Detention Center that if an inmate had a pre-existing condition (such as HIV positive status) prior to their incarceration, then the Detention Center would not provide that inmate with medications for treatment of that condition.  Again, it was left to the inmate's family members to bring medications to the jail for the inmate.  If they did not do so, then the inmate did not receive medication for their condition.

30.     **JOHNSTON**, as the sole member of the Detention Center's medical department, developed and implemented these policies and practices at the Detention Center.  On information and belief, Defendants **SHERIFF BERLIN** and Warden **HENDERSON** were aware that these were the policies and practices at the Detention Center and took no action to change them.

31.     After Andrew's appointment with the HIV doctor on December 18, 2020, **JOHNSTON** followed the normal policy and practice of failing to request information and medical records from this appointment.  Although she was aware medications had been prescribed at this visit,

she also failed to take any steps to obtain and provide Andrew the antiretroviral medications that the outside provider had prescribed.

32.     On December 21, 2020, Andrew was taken to South Central Behavioral Health, where he saw a psychiatrist.  There are no jail records showing what precipitated this referral, and **JOHNSTON** claims she cannot recall why it was made.  Andrew reported a history of depression, anxiety, and substance abuse.  He further reported that he was diagnosed with HIV one month ago.  Although he reported having depression and thoughts of death one week before this encounter, Andrew denied current suicidal ideations and the psychiatrist did not order that suicide precautions be taken for Andrew.  The psychiatrist prescribed Wellbutrin SR 150 mg daily in the morning for Andrew and a follow up in one month.  He also ordered that labs be conducted for Andrew.

33.     Again, **JOHNSTON** did not request any medical records from this appointment, and she took no steps to obtain or provide to Andrew the Wellbutrin that the psychiatrist had prescribed.

34.     After Andrew returned to the jail on December 21, 2020, the lab called South Central Behavioral Health to report a critical high result for Andrew's ALT, which is a test for liver function.  The Behavioral Health nurse reported this result to the psychiatrist, who directed that Andrew be seen by a primary care physician because of the lab result.

35.     The Behavioral Health nurse called the jail on December 21, 2020, and left a voice mail for Defendant **JOHNSTON** about Andrew's test results.

36.     Defendant **JOHNSTON** did not return the Behavioral Health nurse's call.  The nurse therefore left another voice mail for her, which was also not returned.  On December 28th, the nurse attempted to contact **JOHNSTON** through the jail's main phone number and left a message with a deputy asking that **JOHNSTON** return her call.

37.     The nurse tried to reach Defendant **JOHNSTON** yet again on January 4, 2021.  She left another message, and later that day **JOHNSTON** finally returned the call.  The nurse advised **JOHNSTON** of the critical lab values that had been discovered and she also faxed Andrew's lab results to the jail.  The nurse noted that Andrew needed to be seen by another doctor.

38.     On information and belief, **JOHNSTON** never took any action with respect to the critically high lab results.

39.      At some point on January 4, 2020, the Hattiesburg Clinic physician saw Andrew again. The records state that Andrew was seen for HIV follow up.

40.     The Hattiesburg Clinic physician reported as follows: "Patient has not received HIV medications. Patient should be able to pick up medications from Jones County. Patient reported some constipation since last visit. Patient reported sinus congestion/drainage. Patient reported trouble sleeping and 'bed rash' as well."  The physician again prescribed Descovy and Tivicay to treat Andrew's HIV.

41.     According to these records, on January 4, 2021, Andrew was not displaying any neurologic symptoms (such as seizures or shaking).  However, lab reports from this date show that Andrew's CD4 count was at 37.  A CD4 count below 40 means that a person with HIV has progressed to the condition known as AIDS.

42.     After this appointment, **JOHNSTON** again followed her policy and practice of failing to request medical records from outside providers.  **JOHNSTON** also failed to obtain or provide to Andrew the antiretroviral medications the HIV doctor had prescribed.

43.     At some point during the day on January 4, 2021, one of Andrew's siblings brought medications that family members had found at his house up to the jail.  These were likely medications that had been prescribed to Andrew while he was in the rehab facilities.  Although it

is not known exactly which medications these were, none of them were antiretroviral

medications for treatment of HIV.

44.     **JOHNSTON** started to administer these medications to Andrew after his family brought

them in.  She did not consult with any doctor, nurse practitioner, or any other qualified medical

professional before she started to administer these drugs to Andrew.  Furthermore, it is not

known what medications were actually given to Andrew at the jail because there are no records

showing that information and **JOHNSTON** claims not to recall what she gave to him.

45.     On January 9, 2021, Andrew was being held at the Detention Center in the isolation cell,

MX 113, which had no windows except a small port in the door and a food slot, which was kept

locked when not in use.  The cell also contained a video surveillance system.

46.     The Plaintiffs have obtained video surveillance footage from Andrew's cell on the day of

his death.  The footage starts at 6:00 a.m. on January 9, 2021.  It is apparent almost immediately

that Andrew is in dire need of medical attention.  He is obviously incredibly weak and is having

trouble controlling his own body.  His movements are spastic, he shakes uncontrollably, and he

is unable to stand up or walk even a few feet across his cell.

47.     At approximately 6:25 a.m., Andrew struggles to sit up in bed.  He had taken his jail-

issued jumper partially off at some point before, and he attempts to put it back on.  However, his

hands and head are clearly shaking, he cannot stand up from the bed, and he moves like he is

heavily intoxicated.  He attempts to put his arms through the jumper sleeves, unsuccessfully, for

a full ten minutes before he gives up and collapses back on the bed.  It takes him another two

minutes of struggle and effort to get the blanket over his feet and the rest of his body.  It is clear

that he cannot control his own movements enough even to sit up and arrange the blanket over his

feet.

48.     At  approximately 6:53 a.m., after Andrew does not come to the door when called, Defendant Deputy **COLTON DENNIS** throws a laundry bag into the cell.

49.     From approximately 7:01 to 7:08 a.m., Andrew works to take his jumper—which was already partially off—completely off.  Again, it is clear from this footage that Andrew is unable to stand up from the bed, that he is shaking uncontrollably, and that he is suffering from a medical emergency.  At one point, Andrew apparently attempts to reach for his jail issued slippers, which are on the floor approximately two or three feet from the bed.  However, Andrew is not able to reach the slippers, nor is he able to reach the laundry bag that **DENNIS** had thrown into the cell.  It is clear that Andrew is unable to stand up from the bed.

50.     At approximately 7:08 a.m., Andrew finally manages to free himself from his jumper, and he collapses back on the bed.  He then attempts to arrange the blanket over himself for another two minutes.

51.     At approximately 7:51 a.m., Defendant **MANN** unlocks the food slot and calls out to Andrew, who does not respond or get out of bed.  On information and belief, the normal protocol at the Jail is for inmates in maximum security to retrieve their food from the slot.  However, because of his dire medical condition, Andrew is unable to stand up to get his food.

52.     On information and belief, Defendant **MANN** recognized that Andrew was unable to retrieve his food from the food slot.  Therefore, at approximately 7:53 a.m., Defendant **MANN** brings Andrew's Styrofoam tray of food into the cell and places it on a table across from the bed where Andrew is lying.

53.     Shortly after **MANN** leaves, Andrew attempts to get out of bed, probably to retrieve the food.  However, he is unable to stand up.

54.    Starting at approximately 8:00 a.m., Defendants **MANN** and **JAMES** pass out medications to inmates housed in the maximum-security cells.  On information and belief, the general protocol is for inmates to come to the door when called to receive their medications.

55.    When **MANN** arrives at Andrew's cell, Andrew cannot get out of bed to walk to the door.  **MANN** recognizes this and enters Andrew's cell to speak with him.  On information and belief, Andrew told **MANN** that he, Andrew, could not stand up to receive his medications, nor could he walk to get himself any water from the small sink on the other side of the cell.

56.    Around this time, Defendant **JAMES** arrives at Andrew's cell, and on information and belief **MANN** tells **JAMES** that Andrew cannot stand up or walk to receive his medication. **JAMES** and **MANN** hold the door open to Andrew's cell while an inmate trustee retrieves a cup to use to provide Andrew some water to take his medications.

57.    While **JAMES** watches from the doorway, **MANN** enters Andrew's cell and fills the cup with water from the sink.

58.    **MANN** then goes to Andrew in the bed, where Andrew has managed to push himself up to a seated position.  Andrew's body and hands are shaking so badly that **MANN** has difficulty placing the pills in Andrew's hand.  Andrew then drops two of the pills, which **MANN** has to pick up for him.

59.    After Andrew takes the pills, he hands the cup of water back to **MANN**, who places it on the table on his way out of the cell.  However, Andrew asks him for another drink of water, and **MANN** brings the cup back to him in the bed.  These actions show that **MANN**

and **JAMES**, who was watching the interaction, were aware that Andrew could not walk even a few feet to get himself a drink of water.

60.     After **MANN** places the cup back on the table, **MANN** and **JAMES** leave and lock the cell.

61.     At approximately 8:30 a.m., Andrew starts to attempt to get his food from the table across from the bed.  Naked and unable to walk, he manages to throw his blanket on to the ground, and then lowers himself to sit on it.  He then drags himself across the floor of his cell on his buttocks.  When he gets to the table, he reaches up to take the container of food, but his hands are shaking so badly he cannot hold on to the container.  He therefore tries to throw the container over to the bed, but it hits one of his jail-issued slippers and the contents spill on to the floor.

62.     Andrew then struggles around on the floor, trying to make it back to the bed. However, every time he tries to sit up, he falls back on to his back.  It is obvious that he cannot control his body and is in the midst of a medical emergency.

63.     Eventually, and with great effort, Andrew is able to drag himself back on to the bed. He lies on his stomach and tries to eat a few bites of food off the floor.

64.     At approximately 8:40 a.m., Defendant **DENNIS** opens the cell door and observes Andrew lying naked on his bed trying to eat his food off the floor.  It is obvious that something is seriously wrong with Andrew.  However, **DENNIS** simply closes the door and locks the cell again, and he does not request any medical assistance.

65.     For approximately the next ten to twelve minutes, Andrew attempts to put on his jail jumpsuit back on.  However, he is unable to do so because of his condition.  Eventually he

gives up and just drapes the jumpsuit across his body, and then manages to pull the blanket over himself.  His hands and body are still shaking throughout this process.

66.     Andrew lies down after managing to put the blanket over himself.  There are spastic motions for the next hour and a half.

67.     Andrew's last movement occurs at 10:53 a.m., and it is believed he died sometime after that point.

68.     Defendants **MANN**, **JAMES**, and **DENNIS** personally observed Andrew's obvious medical distress during the morning of January 9, 2021, as described above.  However, none of these Defendants took any action to obtain medical help for Andrew despite their awareness of his obvious and serious medical distress.

69.     Defendant **MEKEDES COLEMAN** was assigned to the Detention Center Control Room on the morning of January 9, 2021, where one of her jobs was to monitor the continuous video surveillance feed coming from Andrew's cell.  On information and belief, **COLEMAN** observed Andrew's obvious medical distress via the surveillance video coming from Andrew's cell.  However, **COLEMAN** took no action to obtain medical help for Andrew despite her awareness of his obvious and serious medical distress.  The same is true for any other deputies who worked or were present during relevant times in the control room that morning.

70.     It was not discovered that Andrew was deceased until approximate 4:16 p.m. on January 9, 2021.

71.     After the discovery, Andrew's body was turned over to the Mississippi Office of the State Medical Examiner.  The Medical Examiner opined that the cause of death was HIV infection.

72.     **HIV causes death by overwhelming and destroying a person's immune system such that they cannot fight off secondary infections.  Andrew was suffering from an infection secondary to uncontrolled HIV/AIDS that resulted in his death on January 9, 2021, and in his pre-death suffering.  Because Andrew's HIV was untreated, it had diminished his immune system such that he could not fight off secondary infections, one or more of which resulted in his death and his pre-death suffering.  Thus, while HIV by itself did not cause the death, the untreated HIV was the root cause of the death because it led to the infection or infections that actually killed him and led to his pre-death suffering.** The antiretroviral HIV drugs that had been prescribed to him by the doctor at the Hattiesburg Clinic would have prevented his death **and prevented or mitigated his pre-death suffering.**  Defendant **JOHNSTON** failed to provide these drugs to Andrew despite her awareness that he had received a prescription from the HIV doctor.

73.     Moreover, independent of the ultimate cause of death, the failure of Defendants **MANN**, **JAMES**, **DENNIS** and/or **COLEMAN** to report Andrew's condition on the morning of January 9, 2021, and to take steps that would have led to medical treatment, including transport to the emergency room of a hospital, caused or contributed to his death **and his pre-death suffering**.  Andrew's life would have been saved, **and his pre-death suffering would have been mitigated,** had he been promptly transported that morning to an emergency room for lifesaving treatment.

74.     Andrew's death **and pre-death suffering were** the direct result of unconstitutional policies and practices for inmate healthcare at the Detention Center.  Specifically, as described above, there was a policy and practice of failing to obtain medical records from outside providers who treated inmates.  There was further a policy and practice of failing to

provide medications to inmates with pre-existing conditions unless those medications were brought in by family members.  There was further a policy and practice of failing to provide medications that were prescribed to inmates by outside providers.  There was further a policy and practice of failing to provide any training to deputies or other Detention Center employees on the provision of healthcare to inmates at the jail. Defendants **JONES COUNTY**, **SHERIFF BERLIN**, **HENDERSON**, and **JOHNSTON** were each aware or should have been aware of these problems with healthcare at the Detention Center.  However, these Defendants failed to address these problems with adequate reforms.

75.     Furthermore, Andrew's HIV positive status qualified as a disability under the Americans with Disability Act and Section 504 of the Rehabilitation Act because it impaired his ability to function and resulted in his death **and pre-death suffering**.  The failure to provide the antiretroviral drugs that had been prescribed to treat Andrew's HIV status was an intentional failure to accommodate that disability for which **JONES COUNTY** is liable. Additionally, the failure to send Andrew Jones to the hospital when it was obvious that he was suffering a medical emergency brought on by his disability was another failure to accommodate his disability for which **JONES COUNTY** is liable.

76.     At the time of the detention of Andrew Jones at the Detention Center, Defendants **JONES COUNTY**, **SHERIFF BERLIN**, **HENDERSON**, and **JOHNSTON** knew or should have known of serious deficiencies in the policies, practices and procedures at the Jail related to medical care and observation of prisoners generally.  Despite their knowledge of these serious deficiencies, these Defendants failed to make necessary changes to policies and procedures or to intervene to see that Andrew Jones and others in their custody were provided adequate treatment for serious

health needs.

77.    Defendants **HENDERSON**, **MANN**, **JAMES**, **DENNIS**, **COLEMAN** and **JOHNSTON** were responsible for providing adequate and appropriate custody and care for Andrew Jones while he was detained, including providing adequate medical care and routing him to the hospital in case of a medical emergency.  These Defendants failed in their responsibility to ensure that Andrew Jones was in a safe, appropriate environment and that he was receiving necessary care and accommodations for his serious medical needs, which constituted a disability.  These failures resulted in the death **and pre-death suffering** of Andrew Jones.

78.    The foregoing actions and inactions of all Defendants with respect to the care of Andrew Jones demonstrate deliberate indifference to Andrew's serious medical needs, were the result of that deliberate indifference, and resulted in his death **and pre-death suffering**.  Furthermore, these Defendants' actions and inactions regarding the care of Andrew fell below the applicable standard of care and were reckless, grossly negligent, and negligent, and were willful, wanton, and malicious.

79.    The Defendants are responsible jointly and severally for the death **and pre-death suffering** of Andrew Jones.

### IV.  FIRST CAUSE OF ACTION

80.    Plaintiff repeats and re-alleges each and every allegation of the First Amended Complaint.

81.    The Defendants, acting individually and together, and under color of law, engaged in a course of conduct that acted to deprive Andrew Jones of his constitutional rights and did deprive him of said rights, specifically, the right to a reasonably safe and secure place of detention,

reasonable and adequate medical care, the right to be free from cruel and unusual punishment, and the right to due process and equal protection of the laws as protected by the Fourteenth Amendment to the Constitution of the United States.

## V.  SECOND CAUSE OF ACTION

82.     Plaintiff repeats and re-alleges each and every allegation of the First Amended Complaint.

83.     Defendants **JONES COUNTY** and **SHERIFF BERLIN**, in his individual and official capacities, and Defendants **HENDERSON** and **JOHNSTON**, in their individual capacities, established, condoned, ratified, and encouraged customs, policies, patterns, and practices that directly and proximately caused the deprivation of the civil and constitutional rights of the deceased, as alleged herein, and the damages and injuries described herein, in violation of the Fourteenth Amendment to the Constitution of the United States.

## VI.  THIRD CAUSE OF ACTION

84.     Plaintiff repeats and re-alleges each and every allegation of the First Amended Complaint.

85.    Andrew Jones was a person with a disability—namely, HIV positive status—under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act (ADA).  Andrew's HIV infection impaired his ability to live and function and ultimately caused his death **and pre-death suffering**.

86.    The Jones County Adult Detention Center, which is run by Defendant **JONES COUNTY**, is a public entity that must comply with the Americans with Disabilities Act.

87.    Section 504 of the Rehabilitation Act requires recipients of federal funds to reasonably accommodate persons with disabilities in their facilities, program activities, and services. Section 504 further requires such recipients to modify such facilities, services, and programs as necessary to accomplish this purpose.  On information and belief, **JONES COUNTY** and/or the Jones County Sheriff's Office receive federal funds and therefore must comply with Section 504 of the Rehabilitation Act.

88.    The ADA defines discrimination as the failure to take necessary steps to ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals because of the absence of services for the disabled.  Such services include, inter alia, provisions necessary to achieve effective health care and to protect a person from the risk of death when they are infected with the HIV virus.

89.    Plaintiff is entitled to relief against **JONES COUNTY** because the Detention Center and the individual Defendants named herein, acting in the course and scope of their employment with **JONES COUNTY**, had notice of Andrew Jones's disability but failed to treat it or to make reasonable accommodations for it.  Specifically, the Detention Center did not acquire and provide medications to treat inmates' serious pre-existing health conditions such as HIV. Furthermore, despite their ability to do so, Defendants failed to accommodate Andrew Jones's

disability.  Specifically, they failed to provide him the medications he had been prescribed, failed to appropriately monitor his condition, and failed to take him to the hospital when his disability threatened his life and ultimately killed him.

90.     The failure to accommodate Andrew Jones's disability was intentional and/or deliberately indifferent to his rights under Section 504 and the ADA and was a proximate cause of his death **and pre-death suffering**.

## VII.  DAMAGES

91.     As a result of the actions of the Defendants as described above, damages have been incurred for the pre-death suffering of Andrew Jones (**ie. survival action**) and for the wrongful death of Andrew Jones.  **Plaintiffs seek damages for the loss of society and companionship, love and affection, financial support, household services, and care, comfort, and guidance; mental and emotional anguish; and all compensatory damages available under the law to all who are entitled to seek such damages for the wrongful death of Andrew Wesley Jones. Plaintiffs also seek damages for all pre-death pain and suffering incurred by Andrew Jones.**

## VIII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that after due proceedings are had, including a trial by jury, that there be judgment rendered herein in Plaintiffs' favor and against all Defendants individually and jointly, as follows:

1.     Compensatory and punitive damages in an amount to be assessed by the jury;

2.     Reasonable attorneys' fees as provided in 42 U.S.C. § 1988 or other applicable laws and all costs of these proceedings and legal interest;

3.     All other relief as appears just and proper to this Honorable Court.

Respectfully submitted,

/s/ Robert McDuff
Miss. Bar No. 2532
767 North Congress Street
Jackson MS 39202
601-259-8484
rbm@mcdufflaw.com

/s/ Stephen Haedicke
_____

Stephen J. Haedicke-PHV
1040 St. Ferdinand Street
New Orleans, LA 70117
504-291-6990
504-291-6998 (fax)
stephen@haedickelaw.com
Admitted Pro Hac Vice

Counsel for Plaintiffs

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the above and foregoing motion has been served upon all counsel of record via the Court's ECF/CMF system, which will send notice of filing to all counsel of record.

<u>/s/ Robert McDuff</u>
Co-Counsel for Plaintiff