UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

CORBEY JONES,                              *        CIVIL ACTION NUMBER:
                                           *
        Plaintiff,                         *         2:22-CV-93-KS-MTP
                                           *
VERSUS                                     *
                                           *
JONES COUNTY, MS, ET AL.                   *
        Defendants.                        *

*   *   *   *   *   *   *   *   *   *   *

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SECOND MOTION FOR
JUDGMENT ON THE PLEADINGS BY DEFENDANTS' BERLIN AND HENDERSON**

        Much like the jurisdictional Motion recently denied by this Court, the renewed Motion

for Judgement on the Pleadings by Defendants Berlin and Henderson relies on both a strained

and unnatural reading of the Plaintiffs' Second Amended Complaint ("SAC"), and a

misunderstanding of the relevant law.  Berlin and Henderson's hyper-technical argument about

"shotgun pleadings" should be rejected because the SAC contains a short and plain statement of

the facts of this case, and a fair reading of the SAC shows exactly what the allegations and

claims are against each Defendant.  The Motion's arguments regarding qualified immunity are

equally flawed:  The SAC pleads a clear violation of the Fourteenth Amendment because

Andrew Jones was denied necessary medical care while he was incarcerated at the Jones County

Detention Center, and he died as a result.  The SAC alleges (and the facts will show) that the

Detention Center's policy of refusing to acquire medications for inmates with pre-existing

conditions directly contributed to Andrew's death.  The SAC further alleges that Defendants

Berlin and Henderson—the Sheriff and Warden of the jail, respectively—were aware of this

policy but failed to change it despite the obvious and serious risk of harm it presented to inmates.

The SAC also alleges that Berlin and Henderson failed to provide any training to deputies on

1

how to recognize and respond to a medical emergency.  These actions and inactions violated

clearly established law.  These Defendants are therefore not entitled to qualified immunity.

As a preliminary matter, and to clarify for the Court and Defendants, the Plaintiffs

provide the following chart of claims/theories of recovery that they intend to pursue based on the

facts alleged in the SAC.  Of course, these claims/ theories of recovery may change based on

additional discovery that remains to be completed.  Additionally, the Plaintiffs notes that

underlying all these claims is the factual contention that Defendants' violations resulted in the

death of Andrew Jones.

| **Theory of Recovery** | **Defendant(s)** |
|---|---|
| Individual deliberate indifference based on failure to provide medical care for the obvious medical emergency of Andrew Jones on January 9, 2021 | Mann, James, Dennis, Coleman |
| Individual deliberate indifference based on failure to provide Andrew Jones medications that were prescribed for HIV and failure to direct that Andrew Jones be removed from solitary confinement or monitored appropriately | Johnston |
| Individual deliberate indifference based on (1) inaction in response to unconstitutional policies and practices with respect to medical care for inmates, as described below; and (2) failure to train/supervise regarding proper medical care, appropriate placement and monitoring of inmates, and recognition of medical emergencies | Sheriff Berlin, Henderson, Johnston |
| *Monell* claim based on jail policy of failing to obtain medical records and prescription medications for inmates when prescriptions were ordered by outside physicians and/or to treat inmates' pre-existing conditions | Jones County<br>Sheriff Berlin (official capacity[1]) |

---

[1] The Plaintiff acknowledges that official capacity claims are claims against Jones County.  *See Kentucky v. Graham*, 473 U.S. 159 (1985).

| Conditions-of-confinement claim based on constitutionally inadequate medical care at jail (factual support includes policy of failing to obtain medications for pre-existing conditions or which were prescribed by outside providers; lack of qualified medical staff; failure to obtain or maintain medical records; failure to train guards on observation and recognition of medical emergencies; holding sick inmates in solitary confinement for no reason and without proper monitoring) | Jones County Sheriff Berlin (individual and official capacity) Henderson (individual capacity) Johnston (individual capacity) |
|---|---|
| ADA/Section 504 Claim | Jones County |

## I.    FACTUAL BACKGROUND

This case involves the tragic and preventable death of the Plaintiff's son at the Jones County Adult Detention Center.  The Second Amended Complaint alleges Andrew Jones was booked into the Detention Center on December 9, 2020, after he had wandered into the house of a Jones County Sheriff's deputy while intoxicated and grieving the COVID-related hospitalization of his father (the Plaintiff), for which he blamed himself.  ECF Doc. 94 at ¶¶ 13-17.  During intake at the jail, Andrew disclosed that he was HIV positive.  He also disclosed his on-going and serious psychiatric issues, including that he had previously attempted suicide and was currently thinking about attempting to kill himself again.  *Id*. at ¶ 18.

Andrew was housed in a maximum-security isolation cell (MX113) at the Detention Center for the duration of his incarceration, although the reasons for that placement remain unclear.  *Id*. at ¶ 22. The isolation cell has no windows at all and only a small slot for a food tray in the door.  The slot was kept closed and locked while not in use.  There is a video surveillance camera in the cell, which feeds into a display monitor in the Detention Center Control Room.  *Id*. at ¶ 45.  Other than that, there is only a metal bed, a toilet and sink, and a small metal table attached to a wall.  It does not appear that Andrew was permitted to possess books or any other

means of keeping himself occupied while he was in the MX cell.  There was no intercom for an

inmate to communicate with guards or the Control Room, and the video evidence in this case

shows that guards did not conduct regular checks (*e.g.* fifteen- or thirty-minute checks) on

inmates who were housed in isolation.  ECF Doc. 94 at ¶¶ 44-67.  Although there was no reason

or justification for a first-time offender like Andrew to be held in such punitive conditions, he

would remain isolated and alone in the maximum-security cell for all thirty-one days of his

incarceration at the Detention Center.  *Id*. at ¶ 22.

The SAC alleges the following facts regarding (1) the Detention Center's policies and

practices for inmate health care, (2) Defendants Berlin and Henderson's awareness of those

policies and practices, and (3) Andrew's particular course of medical care while he was at the

Detention Center:

> 20.     During the relevant period, Defendant **JOHNSTON**, a Licensed Practical
> Nurse**,** was employed by Defendants **JONES COUNTY** and **SHERIFF**
> **BERLIN** to provide medical care to inmates at the Detention Center. Defendant
> **JOHNSTON** was a full-time licensed practical nurse and was the only medical
> staff member employed at the Detention Center. At the time, the only other
> medical care for inmates was provided by a Nurse Practitioner working on a
> contract who generally came to the jail one time per week to conduct a clinic for
> inmates who had requested to see him. Defendant **JOHNSTON** created the list of
> inmates the Nurse Practitioner would see. She was also the sole person in charge
> of acquiring and providing medications to inmates who needed them and for
> arranging for inmates to see outside medical providers when necessary.

> 21.     Mississippi licensure requirements provide that a Licensed Practical Nurse
> must be supervised by either an RN or a doctor when providing medical care.
> However, no qualified medical professional supervised Defendant **JOHNSTON**
> as she was providing medical care to inmates at the Detention Center.

> 22.     Although Andrew told the intake booking officer that he had recently
> tested negative for COVID, and although Andrew was not tested for COVID at
> the jail, Andrew was placed in a maximum-security segregation cell by himself
> when he was booked because he previously had COVID. He stayed there during
> the month he was detained even though he should not have been there and should
> have been transferred out. The conditions in that isolation cell were significantly
> worse than in general population.

23.     Before he was arrested, an appointment had been scheduled for Andrew at the Hattiesburg Clinic for December 18, 2020, to see an infectious disease specialist for treatment of his HIV.

24.     Defendant **JOHNSTON** was aware that Andrew was HIV positive. On information and belief, Warden **HENDERSON** and other jail staff were also aware that Andrew was HIV positive.

25.     **JOHNSTON** knew that the December 18th appointment was for Andrew to see a doctor to obtain treatment for HIV. She gave approval for Andrew to be transported to this appointment.

26.     Andrew had been a patient at the Hattiesburg Clinic for many years. He had a history of anxiety, depression, skin ailments, and hypertension. The physician noted that Andrew had tested negative for HIV about two months prior but was now positive. Andrew also reported lesions on his left thigh. The physician noted that Andrew wanted to start medication for HIV. The physician ordered labs and prescribed Andrew two medications used to treat HIV (Descovy and Tivicay).

27.     The lab results showed that Andrew's HIV viral count was extremely high. This condition, called HIV viremia, is life-threatening. However, modern antiretroviral HIV medications like Descovy and Tivicay are extremely effective in quickly reducing patients' viral loads. Improvement in a HIV patient's condition can occur in less than two weeks once they start on these medications. It is therefore extremely important that HIV positive patients receive their antiretroviral medications as soon as possible.

**28.     At the time of this case, the policy and practice at the Detention Center was that JOHNSTON would not request medical records to be sent to her after an inmate attended a medical appointment with an outside provider. The Detention Center would therefore not provide inmates who had seen such outside providers with any medications that the providers may have prescribed for them at the appointment. Instead, it was left to the family members of the incarcerated person to obtain any medications that had been prescribed and bring them to the jail.**

**29.     It was also the policy and practice at the Detention Center that if an inmate had a pre-existing condition (such as HIV positive status) prior to their incarceration, then the Detention Center would not provide that inmate with medications for treatment of that condition. Again, it was left to the inmate's family members to bring medications to the jail for the inmate. If they did not do so, then the inmate did not receive medication for their condition.**

**30.     JOHNSTON, as the sole member of the Detention Center's medical department, developed and implemented these policies and practices at the Detention Center. On information and belief, Defendants SHERIFF BERLIN and Warden HENDERSON were aware that these were the policies and practices at the Detention Center and took no action to change them.**

31.     After Andrew's appointment with the HIV doctor on December 18, 2020, **JOHNSTON** followed the normal policy and practice of failing to request information and medical records from this appointment. Although she was aware medications had been prescribed at this visit, she also failed to take any steps to obtain and provide Andrew the antiretroviral medications that the outside provider had prescribed.

. . .

39.     At some point on January 4, 2020, the Hattiesburg Clinic physician saw Andrew again. The records state that Andrew was seen for HIV follow up.

40.     The Hattiesburg Clinic physician reported as follows: "Patient has not received HIV medications. Patient should be able to pick up medications from Jones County. Patient reported some constipation since last visit. Patient reported sinus congestion/drainage. Patient reported trouble sleeping and 'bed rash' as well." The physician again prescribed Descovy and Tivicay to treat Andrew's HIV.

41.     According to these records, on January 4, 2021, Andrew was not displaying any neurologic symptoms (such as seizures or shaking). However, lab reports from this date show that Andrew's CD4 count was at 37. A CD4 count below 40 means that a person with HIV has progressed to the condition known as AIDS.

42.     After this appointment, **JOHNSTON** again followed her policy and practice of failing to request medical records from outside providers. **JOHNSTON** also failed to obtain or provide to Andrew the antiretroviral medications the HIV doctor had prescribed.

ECF Doc. 94 (emphasis added to paragraphs 28, 29, 30).

On January 9, 2021, the video surveillance footage from MX113 shows that Andrew had

become critically ill and was suffering a medical emergency because of his untreated HIV

infection.  As alleged in the SAC:

46.     The Plaintiffs have obtained video surveillance footage from Andrew's cell on the day of his death. The footage starts at 6:00 a.m. on January 9, 2021. It

is apparent almost immediately that Andrew is in dire need of medical attention. He is obviously incredibly weak and is having trouble controlling his own body. His movements are spastic, he shakes uncontrollably, and he is unable to stand up or walk even a few feet across his cell.

47.     At approximately 6:25 a.m., Andrew struggles to sit up in bed. He had taken his jail issued jumper partially off at some point before, and he attempts to put it back on. However, his hands and head are clearly shaking, he cannot stand up from the bed, and he moves like he is heavily intoxicated. He attempts to put his arms through the jumper sleeves, unsuccessfully, for a full ten minutes before he gives up and collapses back on the bed. It takes him another two minutes of struggle and effort to get the blanket over his feet and the rest of his body. It is clear that he cannot control his own movements enough even to sit up and arrange the blanket over his feet.

48.     At approximately 6:53 a.m., after Andrew does not come to the door when called, Defendant Deputy **COLTON DENNIS** throws a laundry bag into the cell.

49.     From approximately 7:01 to 7:08 a.m., Andrew works to take his jumper—which was already partially off—completely off. Again, it is clear from this footage that Andrew is unable to stand up from the bed, that he is shaking uncontrollably, and that he is suffering from a medical emergency. At one point, Andrew apparently attempts to reach for his jail issued slippers, which are on the floor approximately two or three feet from the bed. However, Andrew is not able to reach the slippers, nor is he able to reach the laundry bag that **DENNIS** had thrown into the cell. It is clear that Andrew is unable to stand up from the bed.

50.     At approximately 7:08 a.m., Andrew finally manages to free himself from his jumper, and he collapses back on the bed. He then attempts to arrange the blanket over himself for another two minutes.

51.     At approximately 7:51 a.m., Defendant **MANN** unlocks the food slot and calls out to Andrew, who does not respond or get out of bed. On information and belief, the normal protocol at the Jail is for inmates in maximum security to retrieve their food from the slot. However, because of his dire medical condition, Andrew is unable to stand up to get his food.

52.     On information and belief, Defendant **MANN** recognized that Andrew was unable to retrieve his food from the food slot. Therefore, at approximately 7:53 a.m., Defendant **MANN** brings Andrew's Styrofoam tray of food into the cell and places it on a table across from the bed where Andrew is lying.

53.     Shortly after **MANN** leaves, Andrew attempts to get out of bed, probably to retrieve the food. However, he is unable to stand up.

54.   Starting at approximately 8:00 a.m., Defendants **MANN** and **JAMES** pass out medications to inmates housed in the maximum-security cells. On information and belief, the general protocol is for inmates to come to the door when called to receive their medications.

55.   When **MANN** arrives at Andrew's cell, Andrew cannot get out of bed to walk to the door. **MANN** recognizes this and enters Andrew's cell to speak with him. On information and belief, Andrew told **MANN** that he, Andrew, could not stand up to receive his medications, nor could he walk to get himself any water from the small sink on the other side of the cell.

56.   Around this time, Defendant **JAMES** arrives at Andrew's cell, and on information and belief **MANN** tells **JAMES** that Andrew cannot stand up or walk to receive his medication.  **JAMES** and **MANN** hold the door open to Andrew's cell while an inmate trustee retrieves a cup to use to provide Andrew some water to take his medications.

57.   While **JAMES** watches from the doorway, **MANN** enters Andrew's cell and fills the cup with water from the sink.

58.   **MANN** then goes to Andrew in the bed, where Andrew has managed to push himself up to a seated position. Andrew's body and hands are shaking so badly that **MANN** has difficulty placing the pills in Andrew's hand. Andrew then drops two of the pills, which **MANN** has to pick up for him.

59.   After Andrew takes the pills, he hands the cup of water back to **MANN**, who places it on the table on his way out of the cell. However, Andrew asks him for another drink of water, and **MANN** brings the cup back to him in the bed. These actions show that **MANN** and **JAMES**, who was watching the interaction, were aware that Andrew could not walk even a few feet to get himself a drink of water.

60.   After **MANN** places the cup back on the table, **MANN** and **JAMES** leave and lock the cell.

61.   At approximately 8:30 a.m., Andrew starts to attempt to get his food from the table across from the bed. Naked and unable to walk, he manages to throw his blanket on to the ground, and then lowers himself to sit on it.  He then drags himself across the floor of his cell on his buttocks.  When he gets to the table, he reaches up to take the container of food, but his hands are shaking so badly he cannot hold on to the container. He therefore tries to throw the container over to the bed, but it hits one of his jail-issued slippers and the contents spill on to the floor.

62.   Andrew then struggles around on the floor, trying to make it back to the bed. However, every time he tries to sit up, he falls back on to his back. It is

obvious that he cannot control his body and is in the midst of a medical emergency.

63.    Eventually, and with great effort, Andrew is able to drag himself back on to the bed. He lies on his stomach and tries to eat a few bites of food off the floor.

64.    At approximately 8:40 a.m., Defendant **DENNIS** opens the cell door and observes Andrew lying naked on his bed trying to eat his food off the floor. It is obvious that something is seriously wrong with Andrew. However, **DENNIS** simply closes the door and locks the cell again, and he does not request any medical assistance.

65.    For approximately the next ten to twelve minutes, Andrew attempts to put his jail jumpsuit back on. However, he is unable to do so because of his condition. Eventually he gives up and just drapes the jumpsuit across his body, and then manages to pull the blanket over himself. His hands and body are still shaking throughout this process.

66.    Andrew lies down after managing to put the blanket over himself. There are spastic motions for the next hour and a half.

67.    Andrew's last movement occurs at 10:53 a.m., and it is believed he died sometime after that point.

ECF Doc. 94.

The SAC further alleges that Defendant Coleman, who was assigned to the Control Room, saw these events occur via the video surveillance feed from Andrew's cell. However, despite her awareness of Andrew's obvious medical emergency, Coleman did nothing to help him:

69.    Defendant **MEKEDES COLEMAN** was assigned to the Detention Center Control Room on the morning of January 9, 2021, where one of her jobs was to monitor the continuous video surveillance feed coming from Andrew's cell. On information and belief, **COLEMAN** observed Andrew's obvious medical distress via the surveillance video coming from Andrew's cell. However, **COLEMAN** took no action to obtain medical help for Andrew despite her awareness of his obvious and serious medical distress. . . .

ECF Doc. 94.

Finally, the SAC describes the roles Defendants Berlin and Henderson played in the

operation of the Detention Center:

6.     **SHERIFF JOE BERLIN**, in his individual and official capacity as
Sheriff of Jones County, is an adult citizen of the State of Mississippi and
domiciled in the Southern District of Mississippi. At all times described herein, he
was the Sheriff of Jones County and, as such, was responsible for the hiring,
training, supervision, discipline, and control of the deputies under his command as
well as all medical personnel providing services in correctional facilities under his
control. He was responsible for all actions of staff and employees of the Jones
County Sheriff's Department. He was also responsible for the supervision,
administration, policies, practices, customs, and operations of the Jones County
Adult Detention Center ("Detention Center" or "the Jail"). He was also
responsible for ensuring appropriate access to services and accommodations for
all individuals with disabilities as defined by the ADA who were incarcerated at
the Detention Center. He was and is a final policy maker. He is liable both
directly and vicariously for the actions complained of herein.

7.     **JANET HENDERSON** (hereinafter **"HENDERSON")** is an adult citizen
of the United States and, on information and belief, was previously domiciled in
the Southern District of Mississippi. At all times described herein,
**HENDERSON** was the Warden of the Jones County Adult Detention Center and
an employee of **SHERIFF BERLIN**. As such, she was responsible for the
supervision, administration, policies, practices, customs, training, and operations
of the Detention Center and its personnel, including but not limited to the
provision of medical care to inmates at the Detention Center. She was also
responsible for ensuring appropriate access to services and accommodations for
all individuals with disabilities as defined by the ADA who were incarcerated at
the Detention Center. She was a final policymaker and was acting under color of
law at all relevant times. She is liable both directly and as a supervisor for the
actions complained of herein. She is sued in her individual capacity.

….

74.     Andrew's death and pre-death suffering were the direct result of
unconstitutional policies and practices for inmate healthcare at the Detention
Center. Specifically, as described above, there was a policy and practice of failing
to obtain medical records from outside providers who treated inmates. There was
further a policy and practice of failing to provide medications to inmates with pre-
existing conditions unless those medications were brought in by family members.
There was further a policy and practice of failing to provide medications that were
prescribed to inmates by outside providers. There was further a policy and
practice of failing to provide any training to deputies or other Detention Center
employees on the provision of healthcare to inmates at the jail. Defendants
**JONES COUNTY**, **SHERIFF BERLIN**, **HENDERSON**, and **JOHNSTON**

were each aware or should have been aware of these problems with healthcare at the Detention Center.  However, these Defendants failed to address these problems with adequate reforms.

ECF Doc. 94.

Based on these facts, the Plaintiffs bring three causes of action in this case.  The First Cause of Action charges that each of the Defendants individually violated the constitutional rights of Andrew Jones, as guaranteed by the Fourteenth Amendment to the U.S. Constitution. The Second Cause of Action charges that Jones County, Sheriff Berlin (individual and official capacity), Henderson (individual capacity), and Johnston (individual capacity) established and perpetuated unconstitutional policies that violated the constitutional rights of Andrew Jones, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.  The Third Cause of Action alleges that Jones County violated the Americans with Disabilities Act and Section 504 of the Rehabilitation Act because of the way Andrew Jones was treated at the Detention Center.

## II.     LAW AND ARGUMENT

The fundamental issue raised in Defendants' Motion is whether the Sheriff and Warden are entitled to qualified immunity where they were aware and approved of the Detention Center's policy of not providing medications to inmates for pre-existing conditions when such medications had been ordered by outside providers to treat life-threatening illnesses like HIV. Because inmates had a clearly established right to receive prescribed medications for life-threatening illnesses at the time of the events of this case, and because the policy at the Detention Center clearly violated that right, these two Defendants are not entitled to qualified immunity and their Motion should be denied.

**A. The Defendants' Motion should be denied because new scholarship has shown that the doctrine of qualified immunity is contrary to the original text of § 1983.**

New scholarship has revealed that the original text of § 1983[2], as enacted in 1871, contained a "Notwithstanding Clause" that apparently abrogated common-law immunities. *See generally* Professor Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101, 166-67. As Professor Reinert explains, this Notwithstanding Clause was mysteriously omitted during a subsequent revision and compilation of the U.S. Code in 1874. Because the project of revising the Code was not intended to change the substance of any laws, and Congress never formally amended § 1983 to delete the Notwithstanding Clause, there is a persuasive argument that the doctrine of qualified immunity—founded on the assumption that Congress intended to incorporate common-law immunities into § 1983—has been in error since its inception. Judge Willett of the Fifth Circuit recently described these "game-changing" arguments in his concurrence in *Rogers v. Jarrett*, 63 F.4th 971, 979-981 (5th Cir. 2023) (Willett, J., concurring). Although the Plaintiff recognizes that only the Supreme Court can change the law of qualified immunity, he submits this argument to preserve his right to appellate review of this issue.

The doctrine of qualified immunity originated in 1967, when the Supreme Court held that Congress intended to retain common-law principles in actions under § 1983. *Pierson v. Ray*, 386 U.S. 547, 557 (1967) ("We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983"). In *Pierson,* the Supreme Court reviewed the version of § 1983 found in the U.S. Code and concluded that the "legislative

---

[2] Section 1983 was originally located in the U.S. Statutes at Large of 1871-1873, ch. 22, § 1, 17 Stat. 13. It then moved to Section 1979 of the U.S. Revised Statutes (1878), then again to 8 U.S.C. § 43 (1925), and finally to 42 U.S.C. § 1983 (1952). This brief uses "Section 1983" to include this entire history.

record gives no clear indication that Congress meant to abolish wholesale all common-law immunities." *Id*. at 554.  Accordingly, the Court granted defendants a "defense of good faith and probable cause" like they would have had at common law.  *Id*. at 557.

The incorporation of common law defenses into § 1983 eventually evolved into the modern doctrine of qualified immunity.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 806-807 (1982) ("As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability.").  With each step along the path of qualified immunity, the Supreme Court has explicitly relied on the supposed silence of § 1983 with respect to the abolition of common-law defenses to ground the doctrine.  *See, e.g., Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (holding that "[c]ertain immunities were so well established in 1871" that "Congress would have specifically . . . provided had it wished to abolish them."); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989) (relying on the presumption that the 42nd Congress "likely intended" for the common law to apply); *Briscoe v. Lahue*, 460 U.S. 325, 337 (1983) ("[W]e find no evidence that Congress intended to abrogate the traditional common-law witness immunity in § 1983 actions.").

However, the whole artifice of qualified immunity may have been founded on what amounts to a scrivener's error.  The Supreme Court has always relied on the version of § 1983 that is contained in the U.S. Code, which was not compiled until three years after the passage of § 1983 in 1871.  The Court has never examined the actual text of the law that was originally passed by Congress as part of the Ku Klux Klan Act of 1871.  And that original text, as contained in the United States Statutes at Large, contains the Notwithstanding Clause that shows that Congress ***did*** in fact intend to abolish common-law immunities when it came to § 1983.

Specifically, the original text of § 1983, with the Notwithstanding Clause in bold, reads as follows:

> That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, **any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding**, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress[.]

*See* Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. at 166-67 (quoting the Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871)) (emphasis added).

The Notwithstanding Clause means that common-law immunity doctrines do not prevent persons from being held liable under § 1983.  *See* Reinhart, 111 Calif. L. Rev. at 167–68 ("Its implications are unambiguous: state law immunity doctrine, however framed, has no place in Section 1983.").  The question, then, is what happened to this original language?  Why does it not appear in the U.S. Code?  The answer appears to be that it was simply left out during a subsequent technical revision and compilation of U.S. laws, one which was not supposed to change the substance of any law.  As Judge Willett describes in *Rogers*:

> "For reasons lost to history, the critical "Notwithstanding Clause" was inexplicably omitted from the first compilation of federal law in 1874.  The Reviser of Federal Statutes made an unauthorized alteration to Congress's language. And that error was compounded when the various revised statutes were later published in the first United States Code in 1926.  The Reviser's error, whether one of omission or commission, has never been corrected."

*Rogers*, 63 F.4th at 980

The Notwithstanding Clause shows that the 1871 Congress explicitly decided that persons can be held liable for § 1983 violations despite any common-law doctrines to the contrary.  The omission of that language in 1874 did not change the law.  Because the doctrine of

qualified immunity rests on the incorrect presumption that the 1871 statute was silent about the common law, the doctrine should be rejected in § 1983 cases as Congress originally intended.

**B.   <u>The Defendants' "shotgun" pleading argument should be rejected.</u>**

Defendants Berlin and Henderson first argue that the SAC should be dismissed because it is a "shotgun" pleading that does not specify the wrongful acts of individual defendants. Although Plaintiffs acknowledge that they perhaps should not have incorporated all preceding paragraphs into each of their causes of action, they submit that the SAC is very clear regarding the individual acts of each of the Defendants.  Indeed, the SAC clearly specifies who did what throughout its factual allegations, and the only time it refers to defendants collectively is when it alleges their mental state and joint culpability for their actions (paragraphs 78 and 79), in the First Cause of Action (paragraphs 80-81), and in the Damages section (paragraph 91).  At all other times, the SAC clearly alleges what each individual Defendant did in this case.

With regard to Defendants Berlin and Henderson, the SAC alleges that they approved of Johnston's policies and practices with regard to medical care at the jail, specifically, that (1) Johnston would not request medical records or prescription information for inmates after they saw outside medical providers and (2) Johnston would not acquire or provide medications for inmate's pre-existing conditions unless family members brought them in, even where, as here, such conditions were life-threatening.  ECF Doc. 94 at ¶¶ 28-30, 74.  It also alleges that they failed to train deputies on monitoring inmates in solitary confinement and on recognizing and responding to medical emergencies.  *Id*.  The Plaintiffs acknowledge that their first and second causes of action overlap to some extent with respect to the individual capacity claims.  But, as explained below, overlapping claims based on common facts do not require dismissal of a complaint, and the SAC's factual allegations are clear, definite, and provide sufficient notice to

Defendants Berlin and Henderson as to the Plaintiffs' claims against them.  Rule 8 of the Federal Rules of Civil Procedure requires no more.

The Fifth Circuit has described a "'shotgun approach' to pleadings," where "the pleader heedlessly throws a little bit of everything into his complaint in the hopes that something will stick."  *S. Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986), *abrogation on other grounds recognized by Childs v. State Farm Mut. Auto. Ins. Co.*, 29 F.3d 1018, 1023-24 (5th Cir. 1994).  A "shotgun" pleading is a "lengthy complaint that incorporates by reference all preceding paragraphs as it progresses through multiple counts."  *Zucker v. Farish*, No. 3:18-cv-1790-K, 2018 WL 6570867, at *3 (N.D. Tex. Dec. 12, 2018).  A hallmark of shotgun pleadings is the "inclusion of irrelevant and unrelated facts not tied to specific causes of action such that the claims made are indeterminate and the defendant's task in defending against them is significantly impaired."  *Jim S. Adler, P.C. v. Angel L. Reyes & Assocs. PC*, 2020 WL 5099596, at *13-14 (N.D. Tex. Aug. 7, 2020), *report and recommendation adopted*, No. 3:19-cv-2027-K-BN, 2020 WL 5094678 (N.D. Tex. Aug. 29, 2020) (citing *Bates v. Laminack*, 938 F. Supp. 2d 649, 667 (S.D. Tex. 2013)).

Even where a complaint possesses some characteristics of "shotgun" pleadings, federal courts have denied motions to dismiss so long as the complaint provides defendants fair notice of the claims against them, as required by Rule 8.  *See, e.g., Langston v. Ethicon Inc.,* No. 3:20-CV-3712 (N.D. Tex. 12/31/21), 2021 WL 6198218 at *3; *In re On Site Fuel Servs., Inc.*, No. 18-04196 (S.D. Miss. 5/8/20), 2020 WL 3712868 at *35; *Collins v. Treasure Bay LLC*, No. 19-cv-51 (S.D. Miss. 8/5/19), 2019 WL 7875053 at *2.  And as the Court explained in *Texas Tamale Company, Inc. v. CPUSA2, LLC*, a complaint can assert multiple causes of action based on the same set of facts, and doing so does not make a complaint an impermissible "shotgun" pleading:

> The Complaint includes seven pages of facts describing the events upon which Plaintiff bases its trademark infringement and unfair competition claims. Plaintiff's Complaint relies on the same factual allegations to support multiple causes of action which include the same elements. . . Plaintiff need not repeat the same facts in connection with each count and requiring it to do so would make the Complaint needlessly repetitive without providing any further clarity. The Complaint contains sufficient factual allegations in support of the legal theories alleged to allow Defendant to respond to the pleading.

No. 4:21-cv-3341 (S.D. Tex. 10/20/22), 2022 WL 20717360 at *2-3

Here, the SAC clearly sets forth the actions of Defendants Berlin and Henderson. As asserted in the Plaintiffs' first two causes of action, they are individually liable for the constitutional violations these actions caused. Accordingly, the SAC should not be dismissed as a "shotgun" pleading.

**C. <u>Defendants Berlin and Henderson are not entitled to the qualified immunity defense.</u>**

Defendants Berlin and Henderson raise a variety of arguments in support of their claim for qualified immunity. Although the standard is high, qualified immunity is not a talismanic, insurmountable defense. Instead, to overcome the defense at the pleading stage, a plaintiff must allege facts that, taken in the light most favorable to the plaintiff, would establish that the defendant violated a clearly established right in such a way that caused injury to the plaintiff. *Backe v. Leblanc*, 691 F.3d 645, 648 (5th Cir. 2012). A right is "clearly established" if it is "one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotation marks and citation omitted). Courts must not "define clearly established law at a high level of generality"; instead, their "inquiry must be undertaken in light of the specific context of the case." *Id*. at 12. Generally, to satisfy this standard, there must be "controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question

with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371- 72 (5th Cir. 2011) (en banc) (internal quotation marks and footnote omitted).  However, where the defendant's conduct is extreme and obviously unlawful, an analogous case is not required.  *Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020).  *See also Joseph on behalf of estate of Joseph v. Bartlett,* 981 F.3d 319, 330 (5th Cir. 2020) (explaining that Supreme Court precedents allow for "rare possibility that, in an obvious case, analogous case law is not needed because the unlawfulness of the challenged conduct is sufficiently clear") (cleaned up).  "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."  *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006) (quoting *Hope v. Pelzer,* 536 U.S. 730, 740 (2002)).

Because the SAC alleges facts showing violations of clearly established constitutional rights, each of Defendants' arguments regarding qualified immunity should be denied, as shown below.

1.  **The SAC asserts both a conditions-of-confinement claim and an episodic-act-or-omission claim.**

The Defendants query whether the SAC asserts a conditions-of-confinement claim or an episodic-act-or-omission claim.  The answer is both.

In *Shephard v. Dallas County*, the Fifth Circuit explained the difference between the two types of claims as follows:

> Constitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a "condition of confinement" or as an "episodic act or omission." *Hare v. City of Corinth, Miss.,* 74 F.3d 633, 644–45 (5th Cir.1996) (en banc). If the plaintiff has properly stated a claim as an attack on conditions of confinement, he is relieved from the burden of demonstrating a municipal entity's or individual jail official's actual intent to punish because, as discussed below, intent may be inferred from the decision to expose a detainee to

an unconstitutional condition. A condition is usually the manifestation of an explicit policy or restriction: the number of bunks per cell, mail privileges, disciplinary segregation, etc. *See Scott v. Moore,* 114 F.3d 51, 53 n. 2 (5th Cir.1997) (en banc) (listing cases deemed to state challenges to conditions of confinement). In some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions "sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice." *Hare,* 74 F.3d at 645. Proving a pattern is a heavy burden, one that has rarely been met in our caselaw. Further, to constitute impermissible punishment, the condition must be one that is "arbitrary or purposeless" or, put differently, "not reasonably related to a legitimate goal." *Bell v. Wolfish,* 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979).

More often, however, a plaintiff's claim, properly characterized, faults specific jail officials for their acts or omissions because the plaintiff cannot establish the existence of an officially sanctioned unlawful condition. In these cases, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Scott,* 114 F.3d at 53. Because the focus of the claim is one individual's misconduct, the detainee is required to prove intent—specifically, that one or more jail officials "acted or failed to act with deliberate indifference to the detainee's needs." *Hare,* 74 F.3d at 648.

591 F.3d 445, 452.

The Fifth Circuit has further explained that, "[s]ignificantly, there is no rule barring a plaintiff from pleading both alternative theories, and a court may properly evaluate each separately." *Estate of Henson v. Wichita Co., Tx.*, 795 F.3d 456, 464 (5th Cir. 2015) (citing *Shepherd*, 591 F.3d at 452 n. 1 (describing a challenge to conditions of confinement as a "claim" that can be pled and evaluated separately from, and in addition to, an episodic-acts-or-omissions claim)).

## 2.   Defendants Berlin and Henderson do not have qualified immunity with respect to Plaintiffs' conditions-of-confinement claim.

The Plaintiffs' conditions-of-confinement claim is premised primarily on the policy that Johnston, the sole full-time medical staff at the jail, would not request medical records from

outside providers to whom she sent inmates for appointments, nor would she take any steps to

obtain medications for inmates who had pre-existing conditions, even where these medications

may have been for life-threatening conditions (such as HIV) and were prescribed at medical

appointments Johnston herself had arranged.[3]  Because this was the explicit policy of the

Detention Center, it constitutes a condition of confinement.  *Shepherd*, 591 F.3d at 452 ("A

condition is usually the manifestation of an explicit policy or restriction: the number of bunks per

cell, mail privileges, disciplinary segregation, etc.").  Conditions of confinement are evaluated

under the *Bell v. Wolfish* standard: "[T]he Government concededly may detain [a pretrial

detainee] to ensure his presence at trial and may subject him to the restrictions and conditions of

the detention facility so long as those conditions and restrictions do not amount to punishment, or

otherwise violate the Constitution."  441 U.S. 520, 536-37 (1979).  The question, then, is

whether this policy was either unconstitutional on its face or amounted to punishment.

The answer to that question is "yes," on both counts.  It is clearly established law that

jailers cannot simply refuse to give an inmate a medication for a serious medical need when that

medication has been prescribed.  *See Easter*, 467 F.3d at 464-65 (finding that it was a

constitutional violation for prison nurse to refuse to provide inmate the heart medications that

had been prescribed); *Domino v. Tex. Dept. Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)

(holding that inmate can establish a constitutional violation by showing that prison official

"refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in

any similar conduct that would clearly evince a wanton disregard for any serious medical

needs."); *Magee v. Williams*, No. 16-0123 (W.D. La. 04/24/18), 2018 WL 1934072 at *1 ("The

---

[3] Andrew Jones was also held in solitary confinement for no reason, and without proper monitoring, which was itself a condition of confinement that violated the Constitution.  *See Sandin v. Conner*, 515 U.S. 472, 481 (1995).

severe consequences for a compromised immune system that can flow from even a short-term deprivation of antiviral medication combined with Plaintiff's attempts to bring his condition to the attention of DWCC staff are sufficient to state a claim for deliberate indifference at this preliminary stage."). *See also Williams v. City of Yazoo, MS*, 41 F.4th 416, 426 (5th Cir. 2022) ("Officers and jailers have long had notice that they cannot ignore a detainee's serious medical needs."); *Alderson v. Concordia Parish Correctional Facility*, 848 F.3d 415, 422-23 (5th Cir. 2017) (finding constitutional violation where there was delay in providing pain medications that had been prescribed); *Blank v. Tabera,* 494 Fed.Appx. 473, 474 (5th Cir. 2012) (reversing dismissal of complaint where inmate alleged constitutional claim based in part on refusal to provide medication for Crohn's disease); *Brown v. Johnson* 387 F.3d 1344, 1351 (11th Cir. 2004) (finding that it was deliberately indifferent and thus a constitutional violation for defendants to completely ignore and fail to provide plaintiff's medications for HIV and hepatitis); *La Bruno v. Miami Dade County*, No. 10-22554-CIV (S.D. Fla. Mar. 23, 2011), 2011 WL 1102806 (holding that inmate pleaded constitutional violation where defendants knew of his HIV status, need for treatment, and declining condition but took no action to provide treatment). Here, the Detention Center's policy was not to provide medications to inmates if the medications were for a condition that pre-existed the inmate's incarceration, unless the inmate's family brought the medications to the jail. Such a policy is directly contrary to the constitutional demand that jail officials may not "refuse to treat" an inmate's serious medical needs. *Domino*, 239 F.3d at 756.

Furthermore, even if the policy were not unconstitutional on its face, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not

constitutionally be inflicted upon detainees *qua* detainees." *Bell*, 441 U.S. at 539.  Clearly established law requires that inmates be provided medications for their serious medical needs, and there can be no conceivable justification for a jail policy of refusing to provide such medications simply because the inmate's medical condition pre-existed their incarceration and they don't have family members who can bring the medications to the jail.  Accordingly, this policy amounts to unconstitutional punishment.

The SAC alleges that both Defendant Berlin and Defendant Henderson were aware of this policy at the Detention Center.  As the Sheriff and the Warden, respectively, either of these Defendants were in position to change the policy. The Sheriff is the chief law enforcement officer of the county, and the jail falls under his purview.  *See* Miss. Code 19-25-69 ("The sheriff shall have charge of the courthouse and jail of his county, of the premises belonging thereto, and of the prisoners in said jail.").  The Warden is the direct supervisor of the jail.  ECF Doc. 94 at ¶ 7.  However, neither of these Defendants made any attempt to address this obviously unconstitutional policy.  Because the policy violated clearly established law, and because it led to Andrew Jones's death, neither Berlin nor Henderson is entitled to qualified immunity with respect to Plaintiffs' conditions-of-confinement claim.

Defendants Berlin and Henderson seem to assert two arguments *vis a vis* this conditions claim.  First, they seem to assert that a conditions claim based on a failure to change a policy can only be asserted as part of a *Monell* claim against an entity.  ECF Doc. 102 at p. 19.  However, supervisors can be individually liable for unconstitutional policies they know about but fail to correct.  *Crittindon v. Leblanc*, 37 F.4th 177, 186 (5th Cir. 2022) ("Supervisory officials may be liable under § 1983 for their failure to adopt policies if that failure causally results in a constitutional violation.");  *Thompkins v. Belt*, 898 F.2d 298, 304 (5th Cir. 1987) ("Supervisory

liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.") (quotations and citations omitted).[4]

Second, Defendants argue that Plaintiffs have not stated a conditions-of confinement claim because their SAC does not allege an "express intent to punish."  ECF Doc. 102 at 21. However, as stated in *Bell*, an express intent to punish is not required where a policy is facially unconstitutional *or* where it is not rationally related to some legitimate institutional need.  Here, there can be no argument that there is a legitimate purpose behind a policy of denying inmates medications simply because the medications are for illnesses that pre-existed incarceration and the inmate doesn't have family members who can bring the medications.  Accordingly, "intent may be inferred from the decision to expose a detainee to an unconstitutional condition." *Shepherd*, 591 F.3d at 452.

### 3.  Neither Berlin nor Henderson is entitled to qualified immunity on the Plaintiffs' episodic-act-or-omission claim.

The Plaintiffs also bring an episodic-act-or-omission claim based on the death of Andrew Jones, which resulted from Defendant Johnston's deliberate failure to provide him necessary medications; the decision to house Andrew in an isolation cell for no reason, where he could not obtain assistance even from other inmates; and Defendants Mann, James, Dennis, and Coleman's deliberately indifferent reaction to Andrew's obvious medical emergency on the day of his death. Defendants Berlin and Henderson, as supervisory defendants, are liable for the episodic-acts-or-omissions of these other defendants under a failure to train and supervise theory.  Although there

---

[4] Additionally, the case Defendants cite for the supposed proposition that they cannot be individually liable based on jail policies, *Buchicchio v. LeBlanc*, No. CV 22-00147 (M.D. La. Feb. 15, 2023), 2023 WL 2027809 at *14, does not contain that proposition.

is no *respondeat superior* liability in § 1983 cases, supervisors can be individually liable under

certain circumstances.  As the Fifth Circuit explained in *Attenberry v. Nocona Gen. Hosp.*,

"supervisors may be liable for constitutional violations committed by subordinate employees

when supervisors act, or fail to act, with deliberate indifference to violations of others'

constitutional rights committed by their subordinates."  430 F.3d 245, 254 (5th Cir. 2005).  The

Court explained:

> Accordingly, to prevail against either [the administrator of a public hospital and
> the director of nursing regarding actions of their subordinates], the Plaintiffs must
> allege, inter alia, that Norris or Perry, as the case may be, had subjective
> knowledge of a serious risk of harm to the patients. . . . Following the Supreme
> Court's clear direction, we "may infer the existence of this subjective state of
> mind from the fact that the risk of harm is *obvious*." *Hernandez [v. Tex. Dep't of
> Protective & Regulatory Servs.*, 380 F.3d 872 (5th Cir. 2004)] at 881 (*quoting
> Hope v. Pelzer,* 536 U.S. 730, 738 (2002)) (emphasis in *Hernandez*).

*Id.* at 255.

Regarding Johnston, the SAC alleges that Defendants Berlin and Henderson were aware

of Johnston's policy and practice of refusing to obtain medical records from outside providers

and refusing to obtain medications that had been prescribed by outside providers for inmates

with pre-existing conditions.  Regarding the remaining Defendants, the SAC alleges that

Defendants Berlin and Henderson failed to provide training on monitoring inmates held in

solitary confinement and recognizing and responding to inmates' medical emergencies.  The risk

of harm from these policies—especially the risk of harm from failing to fill prescriptions of

crucial medication—is obvious, and the inaction of the Sheriff and the Warden in the face of the

knowledge of that risk, as set forth in the SAC, is enough to allege the liability of both.

Against these theories of supervisory liability, the Defendants argue that the SAC does

not allege an underlying constitutional tort.  Specifically, they argue that Johnston did not

commit a constitutional tort when she failed to provide the medications that had been prescribed

for Andrew's HIV.  However, as noted above, it is clearly established law that an official may not refuse to treat an inmate's serious medical condition.  Furthermore, where, as here, the refusal to provide prescribed medication is not based on any medical judgment, but instead because of an inmate's status as an inmate, the Fifth Circuit has found deliberate indifference to the medical need.  *See, e.g., Easter,* 467 F.3d at 463-64 (holding that it would be deliberate indifference if, as alleged, nurse returned plaintiff to cell without prescribed heart medicine because pharmacy was closed); *Loosier v. Unknown Med. Doctor*, 435 Fed.Appx. 302, 306 (5th Cir. 2010) (finding deliberate indifference where "[d]octor chose not to provide him any treatment or medication for his [neck] injury because of his prisoner status, not some medical judgment"); *Perez v. Anderson,* 350 Fed.Appx. 959, 961-62 (5th Cir. 2009) (holding that an inmate stated deliberate indifference claim against prison officials who knew he was in excruciating pain but failed to provide him medical treatment); *Harris v. Gusman*, No. 18-7685 (E.D. La. 2/20/19), 2019 WL 1177730 at *6 (holding that plaintiff stated constitutional claim for deliberate indifference where he alleged prison nurse refused to provide him pain medications without checking his chart but also refused to check chart); *Magee*, 2018 WL 1934072 at *1 (holding that inmate stated constitutional claim for deliberate indifference where he alleged prison doctors refused to provide medications for HIV and chlamydia).  And although Defendants argue that the SAC has not alleged that Johnston acted with subjective deliberate indifference, the SAC in fact alleges such indifference repeatedly, ECF Doc. 94 at ¶¶ 1, 78, and it contains specific facts showing that Johnston was deliberately indifferent (she knew about the HIV appointments, she knew medications had been prescribed, and yet she failed to obtain any records or provide the medications).

Finally, the Plaintiffs note that their contentions are not premised on a mere failure to provide "optimal" care, as Defendants Berlin and Henderson assert.  Instead, Defendant Johnston functionally failed to provide Andrew *any* care for the HIV infection that killed him.  Yes, Johnston arranged for Andrew to attend two appointments with a doctor for his HIV.  But Johnston's complete failure to obtain records from those appointments shows that she was deliberately indifferent to what occurred at those appointments.  Indeed, Johnston's failure to provide the medications that the HIV doctor had prescribed resulted in the appointments being essentially meaningless.  *See Magee,* 2018 WL 1934072 at *1 ("Merely being seen by prison medical staff does not prevent a finding of deliberate indifference if the care provided during those visits is so substandard as to evince deliberate indifference.") (citing *Estelle v.* Gamble, 429 U.S. 97, 104 (1976)).  The SAC alleges that Defendants Berlin and Henderson knew that this was the policy and practice for Johnston at the Detention Center, but they failed to address this patently unconstitutional situation through training and supervision.  Andrew Jones died as a result.  Because it was clearly established law that officials must provide medications for inmates' serious medical needs, and Defendants Berlin and Henderson knew this was not occurring at the Detention Center, they are not entitled to qualified immunity on the Plaintiffs' claims.

### D.  Should the Court Perceive Pleading Deficiencies, the Plaintiffs request leave to amend their Complaint.

If this Court perceives any pleading deficiencies with the SAC, the Plaintiff requests leave to file an amendment to cure such deficiency.  *See Griggs v. Hinds Junior College*, 563 F.2d 179, 180 (5th Cir. 1977) ("Granting leave to amend is especially appropriate, in cases such as this, when the trial court has dismissed the complaint for failure to state a claim."); *Public Health Equip. & Supply Co. v. Clarke Mosquito Control Equip., Inc*., 410 Fed. Appx. 738, 740

(5th Cir. 2010) (finding that district court erred in denying plaintiff's motion to amend complaint after dismissal under Rule 12(b)(6)).

Respectfully submitted,

/s/ Stephen J. Haedicke (LA #30537)
Appearing Pro Hac Vice
Law Office of Stephen J. Haedicke, LLC
1040 Saint Ferdinand St.
New Orleans, LA 70117
(504)291-6990 Telephone
(504)291-6998 Fax
stephen@haedickelaw.com

/s/ Robert McDuff
Robert B. McDuff
Miss. Bar No. 2532
767 North Congress Street
Jackson MS 39202
601-259-8484
rbm@mcdufflaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing motion has been served upon all counsel of record via the Court's ECF/CMF system, which will send notice of filing to all counsel of record, on this 9th day of November, 2023.

/s/ Stephen J. Haedicke