IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

**CORBEY JONES, ET AL.**                                                                 **PLAINTIFFS**

**V.**                                                            **CIVIL ACTION NO. 2:22-CV-93-KS-MTP**

**JONES COUNTY, MS, ET AL.**                                                         **DEFENDANTS**

# ORDER

Before the Court are two motions: (1) a Second Motion for Judgment on the Pleadings based on Qualified Immunity [101] filed by Defendants Joe Berlin, Sheriff of Jones County, and Janet Henderson, Warden of Jones County Adult Detention Center ("JCADC" or "Detention Center") in their individual capacities, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure; and (2) a Second Motion to Dismiss [110] pursuant to Rule 12(b)(6) filed by Defendant Mekedes Coleman, Jones County Deputy, and sued in her individual capacity. Having reviewed all of the parties' submissions, the second amended complaint, and the relevant legal authority, and otherwise being duly advised in the premises, the Court finds Coleman's motion is not well-taken and is hereby denied. As for Berlin and Henderson's motion, the Court finds that it should be granted in part and denied in part.

**I.     BACKGROUND**

This is a case arising from the death of a pretrial detainee, Andrew Wesley Jones ("Decedent"), on January 9, 2021, while he was in the custody of the JCADC. [94] at 1. Plaintiffs are Decedent's father, Corbey Jones, and the Estate of Andrew Wesley Jones (collectively, "Plaintiffs"). Plaintiffs have alleged official capacity claims against Jones County, Sheriff Berlin,

and Warden Henderson. As referenced above, Plaintiffs have alleged individual capacity claims against moving Defendants Berlin, Henderson, and Coleman. Plaintiffs have brought individual capacity claims against Jones County Deputies James Mann, Sgt. Jesse James, and Colton Dennis. Also named as a Defendant in her individual capacity is Patricia Carol Johnston, a Licensed Practical Nurse ("LPN") employed by Jones County to provide medical care to inmates at the JCADC.

Plaintiffs allege that Decedent, a thirty-four year old high school teacher and first-time offender, informed officers at his initial intake at JCADC that he had a history of ongoing and serious psychiatric issues, was suicidal, had high blood pressure, and was HIV+. *Id.* at 6. Even so, Plaintiffs assert that the evidence will show that between December 9, 2020, and January 9, 2021, Defendants deliberately ignored Decedent's serious medical conditions and refused to provide him needed medical treatment, both by failing to obtain and administer medications his doctors prescribed for his HIV+ and psychiatric conditions and by failing to respond to his medical emergency on the day of his death, January 9, 2021. *Id.* at 1.

While he was detained at the JCADC, Decedent was housed in a maximum-security isolation cell without windows. *Id.* at 11. The cell door, however, contained a small port and a tray hole for delivery of meals. *Id*. Additionally, the cell was equipped with a video surveillance system that fed into a central JCADC Control Room. *Id.* at 11, 15.

As for his medical treatment, Plaintiffs allege that Defendant LPN Johnston was the sole person in charge of medicating inmates and making arrangements for inmates to see outside medical providers, when necessary. *Id.* at 6. LPN Johnston gave approval for Decedent to be transported to an appointment, scheduled prior to his arrest, with his infectious disease specialist on December 18, 2020 for treatment of his HIV+ status. *Id.* at 7. For unknown reasons, he was

2

also taken to a separate behavioral health clinic for psychiatric treatment on December 21, 2020. *Id.* at 9. However, pursuant to jail policy, Defendant LPN Johnston did not request medical records from Decedent's medical providers, nor did she obtain medications prescribed by providers at the appointments. *Id.*

Moreover, Johnson was slow to respond to communications from health care providers. Between December 21 and January 4, a behavioral health nurse left four phone messages for Johnston regarding Decedent's December 21 lab work that showed a "critical high result" in a liver function test. *Id.* at 9-10. On January 4, Johnston returned the nurse's phone call. *Id.* at 10. The behavioral health nurse advised Johnson of the lab results and faxed them to her. *Id.* Later that same day, Decedent was transported to his infectious disease medical provider, who prescribed HIV treatment drugs. *Id.* Medical records from the visit document that he reported some constipation, sinus congestion/drainage, trouble sleeping, and a "bed rash." *Id.* However, the physician did not record any neurological symptoms, such as seizures or shaking. *Id.* Critically, medical tests performed at that visit showed the Decedent's HIV+ condition had deteriorated to the condition known as AIDS. *Id.* Nevertheless, Johnston again failed to obtain medical records and medications prescribed by the medical provider following this appointment. *Id.* And although Decedent's family brought some of his medications to the jail at some point on January 4, there are no records documenting the administration and identity of the medications. *Id.* at 11. Even so, it is known that none of them were antiretroviral medications for treatment of HIV, and Johnston claims that she does not recall what medications she gave to him. *Id.*

Based on video[1] surveillance footage of Decedent's cell from January 9, 2021, Plaintiffs allege in detail Decedent's behavior on the day of his death. *Id.* at 11-15. Between 6:00 a.m. and

---

[1] Plaintiffs do not allege that the video footage contained any audio component.

10:53 a.m., he struggled with physical movement, "his hands and head [were] clearly shaking, he [could not] stand up from the bed, and he move[d] like he [was] heavily intoxicated." *Id.* at 11. Decedent did not respond when Defendant Dennis summoned him to the door at 6:53 a.m. and, thereafter, when Dennis threw a laundry bag into the cell. *Id.* at 12. He struggled to remove his jumpsuit and cover himself with a blanket, did not respond to delivery of his breakfast by Defendant Mann at 7:53 a.m., and, due to his shaking, could barely take medications delivered by Defendants Mann and James with a cup of water that Mann obtained for him around 8:00 a.m. *Id.* at 12-13.

Decedent's difficulties with physical movement continued for the next few hours. At approximately 8:30 a.m., while still nude, Decedent dragged himself across the floor on a blanket to the table where Mann had placed a container holding his breakfast, but his hands were shaking so badly that he could not hold the food container. *Id.* at 14. While attempting to throw the container onto his bed, he spilled its contents onto the floor. *Id.* After sitting up, then falling onto the floor on his back several times, Decedent managed to drag himself back to the bed, where he lay on his stomach and ate bites of food off the floor. *Id.* Defendant Dennis checked on Decedent at 8:40 a.m. and observed him lying naked on his bed and eating off the floor, but took no action. *Id.* For the following minutes, Decedent was hampered by physical shaking while he attempted, without success, to dress himself. *Id.* at 14-15. After several more minutes of struggle, he covered himself with his jumpsuit and blanket. *Id.* at 15. Plaintiffs allege that for the next one and a half hours, Decedent exhibited "spastic motions," and all movement ceased at 10:53 a.m. *Id.* Decedent's dead body was not discovered until approximately 4:16 p.m. *Id.* After examining Decedent's body, the State Medical Examiner opined that the cause of death was HIV infection. *Id.*

4

## II. <u>CLAIMS</u>

Based on the foregoing allegations of fact, Plaintiffs make claims pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act/ Rehabilitation Act ("ADA/RA") and allege that Defendants are all liable for the injuries and death of Decedent. *Id.* at 1. Plaintiffs seek damages for the pre-death suffering of Decedent and for his wrongful death. *Id.* at 21.

Turning to the specific facts alleged against Defendant Deputy Coleman in support of § 1983 claims, Plaintiffs allege that she "was assigned to the Detention Center Control Room on the morning of January 9, 2021, where one of her jobs was to monitor the continuous video surveillance feed coming from" Decedent's cell. *Id.* at 15. Plaintiffs allege "[o]n information and belief," that Coleman observed Decedent's "obvious medical distress" but "took no action to obtain medical help" for Decedent, despite "her awareness of his obvious and serious medical distress." *Id.* Plaintiffs further allege that Coleman's and other deputies' failure to report Decedent's condition and "take steps that would have led to medical treatment" could have saved his life, and this failure caused or contributed to his pre-death suffering and death. *Id.* at 16. Plaintiffs allege that these actions "acted to deprive Andrew Jones of his constitutional rights . . . to a reasonably safe and secure place of detention, reasonable and adequate medical care, the right to be free from cruel and unusual punishment, and the right to due process and equal protection of the laws . . ." under the Fourteenth Amendment. *Id.* at 18-19. Thus, Plaintiffs' claims against Coleman may be characterized as an episodic act and omission claim.[2]

Plaintiffs allege both a condition of confinement claim and an episodic act and omission

---

[2] "Constitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a 'condition of confinement' or as an 'episodic act or omission.'" *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009)(citing *Hare v. City of Corinth*, 74 F.3d 633, 644-645 (5th Cir. 1996)). In an episodic-act or omission case, "the detainee complains . . . of a particular act of, or omission by, [an] actor." *Id.* Where the plaintiff's claim does not focus on any particular act or omission, but instead asserts that "a condition, which is alleged to be the cause of a constitutional violation, has no reasonable relationship to a legitimate governmental interest," the claim is one for an unlawful condition of confinement. *Duvall v. Dallas Cnty.*, 631 F.3d 203, 207 (5th Cir. 2011).

claim against Sheriff Berlin and Warden Henderson. Turning to the condition of confinement claim, Plaintiffs specifically allege that Decedent's death and pre-death suffering were the direct result of unconstitutional policies and practices for inmate health care at the JCADC, as follows:

(1) A policy and practice of failing to obtain medical records from outside providers who treated inmates;

(2) A policy and practice of failing to provide medications to inmates with pre-existing conditions unless those medications were brought in by family members;

(3) A policy and practice of failing to provide medications that were prescribed to inmates by outside providers; and

(4) A policy and practice of failing to provide any training to deputies or other JCADC employees on the provision of healthcare to inmates at the jail.

*Id.* at 16-17.

Plaintiffs allege that Defendants Sheriff Berlin, Warden Henderson, as well as Defendants Jones County and LPN Johnston, "were each aware or should have been aware of these problems with healthcare at the Detention Center" and failed to address them with "adequate reforms." *Id.* at 4, 17.

As for episodic act and omission claims against Berlin and Henderson, the Second Amended Complaint alleges that Berlin, Henderson, as well as Defendants Jones County and LPN Johnston "knew or should have known of serious deficiencies in the policies, practices, and procedures at the Jail related to medical care and observation of prisoners generally" and failed to make necessary changes to the policies or to intervene to ensure adequate medical treatment for the serious health needs of Decedent and others in their custody. *Id.* at 17-18. Plaintiffs allege that, in their individual capacities, Berlin and Henderson "established, condoned, ratified, and

encouraged customs, policies, patterns, and practices that directly and proximately caused the deprivation of the civil and constitutional rights of the deceased . . . in violation of the Fourteenth Amendment . . . ." *Id.* at 19. The Second Amended Complaint also alleges that Henderson, deputies, and Johnston were responsible for provision of adequate care and custody for Decedent, but failed to provide adequate medical care, and failed to take him to the hospital. *Id.* at 18.

### III. LEGAL STANDARD

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Motions for judgment on the pleadings under Rule 12(c) are subject to the same standard of review as a motion under Rule 12(b)(6). *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). To survive a motion to dismiss under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Great Lakes Dredge & Dock Co. LLC v. La. State*, 624 F.3d 201, 210 (5th Cir. 2010). "To be plausible, the complaint's factual allegations must be enough to raise a right to relief above the speculative level." *Id.* (punctuation omitted). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This is a "context-specific task that requires the reviewing court to draw on its judicial expertise and common sense." *Id.* at 679.

The Court must "accept all well pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Great Lakes*, 624 F.3d at 210. But the Court will not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Id.*

Likewise, "a formulaic recitation of the elements of a cause of action will not do." *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010)(punctuation omitted. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. It follows that "where well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "This standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008)(citing *Twombly*, 550 U.S. at 556).

"The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Ironshore Europe DAC v. Schiff Hardin, LLP*, 912 F.3d 759, 763 (5th Cir. 2019). The Court may also consider matters of public record, *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995), and any other matters of which it may take judicial notice. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

## IV.   DISCUSSION

Defendants have moved to dismiss Plaintiffs' claims against them in their individual capacities based on the doctrine of qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Although nominally a defense, the plaintiff has the burden to negate the defense once properly raised." *Poole v. Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

There are two steps in the Court's analysis. First, the Court determines whether the defendant's conduct violates an actual constitutional right. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). Second, the Court must "consider whether [the defendant's] actions were objectively unreasonable in the light of clearly established law at the time of the conduct in question." *Id.* A right is "clearly established" if it is "one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). The Court is also mindful that the "inquiry must be undertaken in light of the specific context of the case." *Id.* at 12. The Court may address either step first. *Pearson*, 555 U.S. at 236. "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Brumfield*, 551 F.3d at 326. The Court "applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007). "Although this does not mean that 'a case directly on point' is required, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Ford v. Anderson Cnty.*, 90 F.4th 736, 751 (5th Cir. 2024).

When "a qualified immunity defense is asserted in an answer or a motion to dismiss, the district court must – as always – do no more than determine whether the plaintiff has filed a short and plain statement of his complaint, a statement that rests on more than conclusions alone." *Anderson v. Valdez*, 845 F.3d 580, 589-590 (5th Cir. 2016). This is not a heightened pleading standard, *id.* at 590, but the plaintiff must "plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and defeat a qualified immunity defense with equal specificity." *Hinojosa v. Livingston*, 807 F.3d 657, 664

9

(5th Cir. 2015). The plaintiff must "speak to the factual particulars of the alleged actions, at least when those facts are known to the plaintiff and are not peculiarly within the knowledge of defendants." *Schultea v. Wood*, 47 F.3d 1427, 1432 (5th Cir. 1995). In that respect, the Court treats qualified immunity arguments at the pleading stage no different than the typical 12(b)(6) standard of review under *Iqbal*.

Defendants argue that Plaintiffs have failed to state a violation of "clearly established" constitutional law, and that the Plaintiffs' pleading suffers from other infirmities, such as "shot gun" and "group pleading." On the whole, Plaintiffs have set forth specific factual allegations against Defendant Coleman, but the facts asserted against Defendants Berlin and Henderson are more broad. Even so, Plaintiffs have alleged claims based on long-standing principles of constitutional law. Undergirding Plaintiffs' claims is the well-established concept that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). The *DeShaney* court stated that the rationale behind this principle is simple:

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*Id.* at 200 (citing *Estelle v. Gamble*, 429 U.S. 97, 103-104 (1976)). Moreover, "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* "Pretrial detainees have a constitutional right to medical care and protection from harm during their confinement." *Brumfield*, 551 F.3d at 327. Thus, under the first prong of the qualified immunity test, Plaintiffs have alleged that Defendants violated Decedent's

10

long-recognized constitutional right, as a pretrial detainee, to medical care and reasonable safety.

### A. <u>**Deputy Coleman**</u>

As an initial matter, Coleman moves straight to the second prong of the qualified immunity test. Coleman frames the question facing the Court as whether, at the time of Jones's death in January 2021, a sheriff's deputy could violate the Fourteenth Amendment by failing to recognize an inmate's HIV symptoms from the surveillance camera monitor in the camera-control room, when the symptoms ultimately led to the inmate's death. [111] at 4-5. The State's constitutional duty to protect pre-trial detainees, however, is not so narrowly drawn. Instead, as of January 2021, the Fourteenth Amendment guaranteed pretrial detainees a right "'not to have their serious medical needs met with deliberate indifference on the part of the confining officials.'" *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020)(citations omitted)(finding that officers who in August 2013 witnessed pre-trial detainee bashing his head against interior of patrol car, who did not seek medical attention for him, and who did not inform booking officers of same were not entitled to summary judgment based on qualified immunity). And although Coleman may argue that she did not have a subjective awareness[3] that Decedent's symptoms were related to his HIV+ diagnosis, that is of no moment. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)(citations omitted). Decedent's medical emergency was an "obvious" risk of harm, one not limited to someone suffering from HIV. *See Ford*, 90 F.4th at 759-760 (finding that jailors' failure to monitor or provide immediate medical assistance to a pretrial detainee who was unable to walk, collapsed, and vomited upon collapsing constituted deliberate indifference; finding that the right

---

[3] For claims related to the medical treatment of a pretrial detainee, the "court will find a constitutional violation where an officer: (1) subjectively knew of a substantial risk of serious harm to the detainee; and (2) responded to that risk with 'deliberate indifference.'" *Ford*, 90 F.4th at 752.

to medical assistance was clearly established dating back to 2003.)(citing *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006), and *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003)).

According to the Second Amended Complaint, Coleman was tasked with monitoring surveillance video feed from Decedent's cell, which showed that Decedent shook uncontrollably, was weak, could not walk, fell onto his back on the floor from a seated position several times, had trouble feeding himself, could not rise off the bed to get a cup of water, needed assistance in taking his medications, could not clothe himself, and had trouble covering himself with a blanket over the course of several hours. Decedent's "spastic" movements began around 6:00 a.m. and continued until just before 11:00 a.m., after which he died. Presumably, Decedent did not move for about five hours, between 11:00 a.m. and approximately 4:16 p.m., when his dead body was discovered. Even if Decedent had not been suffering with HIV, these conditions fall into the category of obvious medical emergencies to which an officer, tasked with visually monitoring and protecting her charge who has no method of verbally contacting her for help, must react with action, not inaction. *See Dyer*, 964 F.3d at 382 (denying qualified immunity for officers who failed to seek medical care for pretrial detainee suffering from "plainly evident" head injuries).

Although Coleman argues the right was not clearly established, the cases on which she relies may be distinguished. Ignoring an inmate's intercom call for help for about three minutes is vastly different than failing to observe and raise an alarm to instances of "obvious" medical emergency over the course of several hours. *See Reed v. Nacogdoches Cnty.*, No. 22-40126, 2023 WL 3563017 (5th Cir. May 19, 2023)(finding that control room operator who in 2017 ignored pretrial detainee's seven intercom calls over three minute period while on personal phone call was entitled to qualified immunity). Likewise, it was not incumbent upon Coleman to enter Decedent's cell or necessarily call emergency medical services; she simply had to raise an alarm and notify

12

other JCADC personnel of Decedent's obvious medical emergency. *See Cope v. Cogdill*, 3 F.4th 198, 208-209 (5th Cir. 2021)(finding that jailor's failure to enter cell of pretrial detainee suicide victim and begin CPR was consistent with jail policy and was, at most, negligence; finding that jailor's failure to call promptly for emergency medical services did not constitute unconstitutional conduct in 2017; making "clear that promptly failing to call for emergency assistance when a detainee faces a known, serious medical emergency – e.g., suffering from a suicide attempt – constitutes unconstitutional conduct" as of July 2021).

Accordingly, the Court finds that Plaintiffs have stated a plausible claim that Coleman, in her individual capacity, denied Decedent his constitutional rights to reasonable safety and adequate medical care, as secured by the Fourteenth Amendment. Thus, Coleman's Second Motion to Dismiss, based on qualified immunity, is hereby denied.

## B. Defendants Sheriff Berlin and Warden Henderson

Plaintiffs have alleged episodic act and omission claims against Defendants Sheriff Berlin and Warden Henderson in their individual capacities related to Decedent's health care and safety. Plaintiffs also assert a condition of confinement claim against Berlin and Henderson in their individual capacities.

Turning first to the episodic act and omission claim, Plaintiffs allege that Berlin and Henderson, along with the individually named deputies and Johnson, were responsible for provision of adequate care and custody for Decedent, but failed to provide adequate medical care, and failed to take him to the hospital. *Id.* at 18. Plaintiffs' complaint is severely lacking in any factual allegations supporting an episodic act and omission claim against Berlin and Henderson alleging that they, in their individual capacities, personally subjected Decedent to deliberate indifference regarding provision of medical care. There are no factual allegations that Berlin and

13

Henderson affirmatively participated in acts that caused a deprivation of his constitutional rights. *See Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992). In other words, there are no factual allegations that they were personally involved in the day-to-day decisions surrounding the provision of medical care for Decedent. There are also no facts alleged to support a claim that they subjectively knew of a "substantial risk of serious harm" to Decedent and responded to that risk with "deliberate indifference." *Ford*, 90 F.4th at 752. The second amended complaint simply alleges that "on information and belief" Henderson was aware of Decedent's HIV+ status, [94] at 7, and makes no allegation that Henderson was aware of his psychiatric issues. Likewise, the second amended complaint fails to allege that Sheriff Berlin was personally aware Decedent's HIV+ status or his psychiatric conditions. Accordingly, their motion is granted as to that aspect of Plaintiffs' claims.

On the other hand, Plaintiffs have stated a "plausible" condition of confinement claim against Sheriff Berlin in his individual capacity related to the establishment and execution of the policies and practices surrounding the provision of medical care to JCADC detainees. Under Mississippi law, Sheriff Berlin is the final policymaker regarding administration of the county jail. *See Brooks v. George Cnty., Miss.*, 84 F.3d 157, 169 (5th Cir. 1996)("Sheriffs in Mississippi are final policymakers with respect to all law enforcement decisions made within their counties."). Sheriff Berlin may be held liable under § 1983 for implementing "unconstitutional policies that causally result in plaintiff's injury." *Mouille*, 977 F.2d at 929.

The same holds true for Warden Henderson. A plaintiff can assert a viable "failure to adopt policies" claim when the allegations plausibly establish that the supervisory official acted, or *failed* to act, with "deliberate indifference," that is "a disregard for a known or obvious consequence of [her] actions." *Crittindon v. LeBlanc,* 37 F.4th 186, 188 (5th Cir. 2022) (citing *Porter v. Epps*,

14

659 F.3d 440, 446 (5th Cir. 2011)).  Stated differently, "[l]iability may be found where 'supervisory officials implement a policy so deficient that the policy "itself is a repudiation of constitutional rights" and is "the moving force of the constitutional violation."'" *Ford*, 90 F.4th at 765 (citations omitted).

The policies at JCADC resulted not only in a delay in medical care, but an outright denial of medical care to Decedent and his serious medical needs.  Even though Defendants Berlin and Henderson argue that Decedent was transported to three outside provider appointments during his detention, thus there can be no "deliberate indifference," the Jail's failure to obtain medical records and resulting prescriptions (either from the provider or family) still amounted to a denial of medical care.  In January 2021, Decedent "had a clearly established right to not be denied, by deliberate indifference, attention to [his] serious medical needs under the Fourteenth Amendment."  *Id.*  Considering Sheriff Berlin and Warden Henderson's alleged established policy and practice of not obtaining medical records from outside providers, not obtaining medication prescribed by them, placing the burden on family members to provide medications, and failing to provide any training to employees on the provision of healthcare, the Court concludes that it was "'obvious that the likely consequences . . . [would] be a deprivation of civil rights, '" or, even more, Decedent's death.  *Id.* (citations omitted).  Likewise, because a delay in medical care may constitute a Fourteenth Amendment violation, and because "an unconstitutional delay in care is a highly predictable consequence" of these alleged policies of "delaying medical care for critically ill detainees," the Court finds that Plaintiffs' pleadings are sufficient to overcome the qualified immunity defense of Sheriff Berlin and Warden Henderson at the motion to dismiss stage.  *Id.*

### V. **CONCLUSION**

Accordingly, for the reasons set forth above, the Court hereby denies Defendant Coleman's

Second Motion to Dismiss [110].

As for the Second Motion to Dismiss [101] filed by Defendants Sheriff Berlin and Warden Henderson, the Court grants in part and denies in part the Motion [101], as follows:

1. The Motion [101] is granted as to Plaintiffs' episodic act and omission claims against Sheriff Berlin and Warden Henderson regarding the provision of medical care.

2. The Motion [101] is denied as to Plaintiffs' condition of confinement claim against Sheriff Berlin and Warden Henderson in their individual capacities related to the establishment and execution of the policies and practices surrounding the provision of medical care to detainees.

SO ORDERED AND ADJUDGED this   12th   day of April, 2024.

                                  /s/ Keith Starrett
                                  KEITH STARRETT
                                  UNITED STATES DISTRICT JUDGE